[PHILADELPHIA, APRIL 16, 1835.]

## PENNOCK *against* HOOVER and MYERS.

### IN ERROR.

The commencement of a building under the act of the 17th of March, 1806, relating to the lien of mechanics and material men, is, the first labour done on the ground which is made the foundation of the building, and to form part of the work suitable and necessary for its construction; and that continues the same, notwithstanding the right of property in the ground and building may have been subsequently changed, or the plan be altered, so long as the orignal design of its character is retained.

A joint-lien may be filed against several adjoining houses, the property of the same person.

A mechanic or material man doing work in, or furnishing materials for the construction of two or more contiguous houses belonging to the same person, under a general request, without any specific contract for each house separately, may either file his claim for the amount against all the houses jointly, or he may apportion it among them according to the value or price of the materials or work, and file a separate claim accordingly. Per KENNEDY, J.

The lien of the mechanic and material man does not extend beyond ground necessary to the proper occupation and enjoyment of the house, according to the intention and design of the owner at the time of its commencement.

An assessment by the commissioners of Kensington District, for paving, is, under the act of the 3d of February, 1824, relating to taxes on real estate in the city and county of Philadelphia, a lien entitled to priority over the claims of mechanics and material men, and judgment creditors.

Where eighteen buildings were erected, *semble*, a claim against eight houses without properly designating them, is void for uncertainty, and cannot continue the lien after two years.

Where a claim was so filed, it was wrong to apportion the claim among all the houses.

In the case of a joint lien, each building is liable for the whole amount thereof; and no part of the proceeds of any one of the buildings can be applied to a subsequent incumbrance, so long as the joint lien remains unsatisfied.

A mechanic filed four claims, three of which were jointly charged, each on three of the

houses, and a fourth on four of the houses. Each claim embraced houses different from those charged in every other. *Held*, that each claim should be separately charged on the proceeds of the houses specified in it, and not the aggregate charged as one entire claim jointly on the thirteen houses embraced in the four several claims.

THIS case arose upon exceptions to the report of the auditor appointed to ascertain and report the several liens affecting the fund arising from the sale of all the right, title, and interest of *Hoover* and *Myers*, in a lot of ground, with the eighteen unfinished messuages thereon erected, situated in the Kensington District, and sold under a *venditioni exponas* at the suit of *Horatio B. Pennock*, the plaintiff, who purchased the property at sheriff's sale, for the sum of four thousand six hundred dollars.

The material facts were as follows:

Sometime in the year 1828, *Warnet Myers* entered into a contract with General *Cadwalader*, the agent of Mrs. *Penn*, for the purchase of a lot of ground on the east side of Second street, between Phœnix and Masters streets; containing in front 438 feet 6 inches, and in depth 248 feet to Hancock street, and extending on Hancock street 506 feet 5½ inches. By the terms of the contract, a ground rent of eight hundred and twenty-one dollars was reserved on the lot; and it was stipulated that as soon as brick buildings should be erected on portions of the lot sufficient to secure the ground rent reserved, *Myers* should receive a deed in fee simple for the remainder of the lot. *Myers* accordingly proceeded to dispose of part of the ground, and in the winter of 1828, let out certain lots on Second street, under contracts, by which a certain proportionate ground rent was to be reserved to Mrs. *Penn* for each lot, to be paid by the under purchasers, who in the spring of 1829 began their improvements. The progress of these buildings was suspended about the beginning of June, 1829, and on the 16th of that month, *Myers* made an assignment of all his estate and effects to *Benton Costen* and *Robert Jarden*, in trust, for the benefit of creditors. On the 15th of August, 1829, the assignees made a formal surrender of the contract to General *Cadwalader;* and on the same day a new agreement in writing was made between Mrs. *Penn*, by her attorney, General *Cadwalader*, on the one part, and *Samuel Hoover* on the other part, by which the same lot was let to *Hoover* on the same ground-rent that was provided in the former contract, and with the same stipulations and covenants. The name of *Hoover* was used in this instrument merely as a trustee for *Myers*, who in point of fact was the real party to the contract, and conducted all the business arising out of it. Shortly after the date of this agreement, *Myers* made arrangements for the construction on his own account of eighteen two story brick buildings on the Second street front, and entered into contracts for the purpose with various mechanics. Circumstances again occurred to involve him in difficulties, and after the buildings had been got under roof, their progress was suspended

again, partially resumed in the spring of 1830, and finally abandoned by him in the fall of that year.   About this time a conveyance was made by General *Cadwalader*, of a portion of the ground, being two lots on Hancock street, one 220 feet, and the other 206 feet in front, and extending in depth to Perry street, under contract to *Thomas B. Longstreth*, in consideration of the arrears of the ground rent then due, and a debt to *Longstreth* for work done to the buildings or some of them.

On the 6th of July, 1831, the buildings being still in an unfinished condition, the sheriff's sale took place of all the right, title, and interest of *Hoover* and *Myers* in the houses and that part of the lot which had not been conveyed to *Longstreth*, under which sale the fund to be distributed arose.

Upon this fund thus created, various claims were presented for taxes, judgments and liens of mechanics and material men.

A claim was presented on behalf of the corporation of Kensington, for the expenses of paving in front of property on Second below Masters street, with interest from October 12th, 1829.

The auditor reported that this claim, if entitled at all to payment out of this fund, must be postponed to the liens of the judgment creditors and mechanics.

This was the subject of exception by the commissioners.

Various judgments binding the real estate of *Myers* and *Hoover* were presented as affecting this fund : as to one of these judgments, in favour of *Horatio B. Pennock*, under which the property was sold, evidence was given before the auditor to show that it was entered in violation of the agreement between the parties.   The bond which was the foundation of it, was given on the 10th of October, 1829, by *Myers* and *Hoover*, in the penal sum of two thousand four hundred dollars, conditioned for payment of the sum of one thousand two hundred dollars, and judgment was entered on the same day.   *Myers*, whose competency as a witness was objected to by the plaintiff, but who was admitted by the auditor, testified, that being indebted to *Pennock* in a certain amount, it was proposed that he should give *Pennock* a ground rent of seventy-two dollars per annum, to issue out of the house and lot at the corner of Second and Phœnix streets, provided General *Cadwalader* would consent to accept an order from *Myers*, and give a deed to *Pennock*, clear of the general ground rent.   Some difficulty arising in obtaining this consent, *Myers* agreed to give the bond in question, and, as he stated, with an express and distinct agreement, that judgment was not to be entered up until the month of December following, and then only on failure to obtain the deed from General *Cadwalader*; and that in his existing position with regard to the mechanics and others engaged in the construction of the houses, he would not voluntarily have given a judgment to any person.   The judgment, in this case, was entered in the Supreme Court, and, according to the testimony of

*Myers, Pennock* informed him that it was entered *there*, that it might not be seen by many.    The agreement, of which parol evidence was given by *Myers*, was alleged by him to have been committed to writing at the time; and he testified that he had made diligent search for it previous to his examination without success, and that he believed it was lost or destroyed.    It was contended on the part of other creditors, that, under these circumstances, the judgment of *Pennock* ought to be considered as a nullity, or, at all events, that it ought to be postponed to those liens which were obtained or accrued prior to the month of December.

The auditor however, deeming himself bound to take every judgment to be duly entered and obtained, both as to consideration and date, until it should be opened or set aside by the court in which it was entered, treated the judgment as a valid one, but reported the testimony given by *Myers* in relation to it, that the court might take such measures as they thought fit, to determine the question of its regularity.

It appeared that the lot of which all the right, title, and interest of *Myers* and *Hoover* was sold by the sheriff, contained four hundred and thirty-eight feet six inches on Second and Perry streets, by one hundred and fifteen feet in depth, eighty feet five inches on Hancock street, and seventy-three-feet on Perry street, by one hundred and three feet in depth.   The buildings contained together two hundred and ninety-three feet eight inches on Second street; and it was testified by *Myers* that he intended to give the lots belonging to them an uniform depth of sixty feet; thus leaving a front on Perry street with a depth of fifty-five feet.   No fence or other line of demarcation was put up.   The auditor considered a depth of sixty feet to be the usual and fair proportion of ground for houses of about sixteen feet front, and that all ground not covered by the buildings or included within the depth of sixty feet from the east side of Second street, ought to be considered as the proper subject of the lien of judgment creditors.

Testimony was produced of the absolute and relative value of the buildings with the accompanying lot, and of the vacant ground: the result of which was, that the whole value of the buildings and vacant ground being considered as four thousand six hundred dollars, the proportion of the buildings with sixty feet lots was about three thousand dollars.   The auditor distributed the fund among the judgment and lien creditors, in the proportion furnished by this valuation.

The liens of mechanics and material men.

Several questions affecting these liens were made before the auditor, as to which he reported as follows:

Before enumerating in detail the claims classed under this head,

(Pennock *v.* Hoover and Myers.)

it is proper to dispose of two or three general questions affecting a considerable number of them.

1. The first and most difficult, both with respect to the facts and the law, is the question of the *commencement* of the buildings, under the act of 1806, which provides that the lien of the mechanics, &c. " shall not continue longer than two years *from the commencement of the building* thereof, unless an action for the recovery of the same be instituted, or the claim filed within six months after performing the work or furnishing the materials," &c.

In some of the cases hereafter to be mentioned, claims were not filed within six months after performing the work or furnishing the materials. It became therefore important to ascertain whether the buildings were sold by the sheriff before or after the expiration of the two years from their commencement; and several witnesses were examined before me upon this point, whose testimony was inconsistent and unsatisfactory with respect to dates, and the distinction of particular buildings. The best conclusion that I have been able to come to upon the facts is, that the house at the corner of Second and Phœnix streets, (No. 1,) the two adjoining houses, (Nos. 2 and 3,) and three other houses, (Nos. 13, 14, and 15,) were commenced, in point of fact, by the digging of the cellars, and the, at least partial, walling of the same, previously to the assignment made on the 16th of June, 1829, by *Myers*, and, consequently, more than two years before the sheriff's sale; and according to the decisions and general understanding, the commencement of a building, *in law*, takes place with the digging and walling of the cellars. It was contended, however, that whatever acts were done before the assignment were of no importance to this question: that the work then done having been abandoned by those who commenced it, and a considerable interval having elapsed before the new contract was made with Gen. *Cadwalader*, and the buildings undertaken by *Myers*, a new commencement ought to be considered as having taken place when the mechanics began their operations under his directions. It was stated in evidence, also, by *Myers*, that on his setting out with his buildings, after the new contract, he altered in some degree the plan of the cellars, which had been dug and walled; and this was urged as an additional reason for considering the commencement to have then taken place.

It appears to me, however, that this construction of the law involves greater difficulties than the opposite doctrine. I submit, that in general there can be but one commencement of a building, either in fact or law. It is possible that a case may arise, in which, in contemplation of a building, a cellar may be dug and walled, and even some of the carpenter's work done, and then a total abandonment may take place, and continue for such a period of time as fairly to entitle the renewed operations to the character of a commencement. In the case of *The American Fire Insurance Company*

v. *Pringle,* 2 *Serg. & Rawle,* 138, C. J. Tilghman said, "Extreme cases may be put which are not within the meaning of the law. Houses are sometimes finished sufficiently for particular purposes, such as warehouses or stores, but not for dwelling-houses; and they may remain in this situation *for years,* and then be completely finished. In such cases the completion of the work might fairly be considered as a *new building,* and ought not to be connected with the first part of the building, so as to give a lien from the original commencement. But the present is not such a case, and therefore the reasoning does not apply." In that case the building of the house was commenced by Mr. *Mullowney,* who sold it before it was finished to *Pringle,* by whom it was completed. And it was held, that the commencement of the building in law, was in the time of *Mullowney,* and the liens of the mechanics were referred back to that period.

This authority, which was recognised and enforced in *Hern* v. *Hopkins,* 13 *Serg. & Rawle,* 269, appears to me applicable and conclusive. The only difference in the cases being, that in the present there were some immaterial alterations in the plan of the buildings, after they came into the hands of *Myers.* This appears to me, however, not to affect the principle or sufficient to impair the rule laid down in the case cited. It may be remarked in addition, that the doctrine which would fix the legal commencement of the building at the resumption of the work, would be attended with much worse consequences for the mechanics; since in that case, an incumbrance created or suffered by the owner of the ground, between the period of the original commencement and the re-commencement would cut out all their liens; whereas by due diligence in filing their claims "within six months after performing the work," &c. they would obtain a preference relating back to the very first step in the commencement of the building, which no act of the landlord could impair or diminish.

I report, therefore, that the buildings which were in point of *fact* commenced by the digging and walling of the cellars previously to the new contract with Gen. *Cadwalader,* must be taken *in law* to have been commenced at that period—and, consequently, that the liens of the mechanics, &c. upon those buildings, of which the claims were not filed within six months after performing the work, &c. expired with the two years as against the other lien or judgment creditors.

2d. The next general question arising under this head respects claims filed against more than one building. It was contended that such claims were invalid; and that for work done or materials furnished, the claim ought to be specifically filed against each specific building. Whatever may be the rule where there are several owners of different adjoining buildings, it appears to me that where the buildings are the property of the same person, no serious evil or

(Pennock *v.* Hoover and Myers.)

inconvenience is experienced by joint claims.   In the case of the lumber merchant, brickmakers, and others furnishing materials, it is always difficult, and sometimes impossible, to ascertain to which of a row of buildings the materials were actually applied; and even in the case of some of the mechanics, as the bricklayer who con structs a parapet wall between two houses, or the carpenter who prepares boards at his workshop, similar difficulties would exist. The acts of assembly do not forbid such joint claims, and in the absence of authoritative· decision on the subject, I report that such claims are valid.

The great difficulty, in the case of materials furnished, and which is not removed by the *filing* of separate claims, consists in the proper apportionment of the amount to each house.   Where direct evidence has not been furnished on this point I have made an equal division of the amount proved, which, as the houses were of nearly uniform size and structure, appeared to me as equitable a mode as any that could be adopted.

3d.  The houses having, together with the lot, been sold for a  gross . amount, it was necessary, in order to do justice between the several claimants, to ascertain the value of each relatively to the amount, which, upon the evidence already adverted to, I had fixed as the proportion of all the buildings.   For this purpose I requested to be furnished with the testimony of persons competent to judge of the value of such property.   Three witnesses were accordingly examined, viz. *John H. James, James Shaw,* and  *Warnet Myers.* The first two stated the value of each house, which together made the sum of ten thousand two hundred and twenty dollars.   Mr.· *Myers,* in company with *Edmund Shotwell,* made an average valu ation, which differed very little in its results, producing in the whole the sum of ten thousand eight hundred dollars.   Taking the first named valuation as sufficiently accurate, and reducing it to the . measure of the purchase money allotted to the whole of the build-ings, viz. two thousand six hundred and eight dollars and seventy cents, the proportion of each house in that amount, will be as follows, viz:

| No. 1 | . | . | $299 72 |
|---|---|---|---|
| 2 | | | 146 77 |
| 3 | | | 146 77 |
| 4 | | | 114 86 |
| 5 | | | 114 86 |
| 6 | | | 114 86 |
| 7 | | | 114 86 |
| 8 | | | 127 62 |
| 9 | | | 127 62 |
| 10 | | | 135 30 |
| 11 | | | 135 30 |
| 12 | | | 135 30 |

(Pennock *v.* Hoover and Myers.)

| No. 13 | 194 | 00 |
| 14 | 194 | 00 |
| 15 | 194 | 00 |
| 16 | 127 | 62 |
| 17 | 127 | 62 |
| 18 | 127 | 62 |
| | $2608 | 70 |

A claim for three hundred and ninety-one dollars and fifty-two cents, for bricks furnished, was presented by *George Thorn.*

The entries in his book were general. No particular house was charged. He filed a claim however in the District Court within the six months, against *eight* houses only, without specifying them. No evidence was given that the materials were furnished for any particular buildings. The auditor, apportioned the amount of the claim *pro rata,* among all the houses, allotting an equal sum to each house.

A claim for three hundred and thirty-six dollars and seventy-five cents, was made by *Isaac Childs* for work done as a stone mason, to thirteen houses, beginning at the corner house, No. 1, thence extending north as far as, and including No. 10; and also to Nos. 14, 17, and 18. He filed four claims on the 8th of March, 1830, viz. first for eighty dollars and seventy-nine cents, against three houses; second, for ninety-nine dollars and fifty cents against four houses; third, for eighty dollars and seventy-nine cents against three houses, and fourth, for eighty dollars and seventy-nine cents against three houses. The claim was filed within six months after the work was done. The auditor upon the evidence before him reduced the claim to two hundred and seventeen dollars and thirty-eight cents, which he apportioned *pro rata* among the thirteen houses.

*Samuel Thomas* claimed four hundred and thirty-one dollars and sixty cents, for carpenters' work to Nos. 12, 13, 14 and 15. A claim for five hundred dollars, was filed by him on the 5th of October, 1831, after the sheriff's sale, and, of course, more than six months after the work was performed. It appeared from the evidence, that he had been paid seventy-nine dollars on account, leaving due to him a balance of three hundred and fifty-two dollars and sixty cents, which divided among the four houses, would give to each the sum of eighty-eight dollars and fifteen cents; but as Nos. 13, 14 and 15, were commenced more than two years before the sheriff's sale, the auditor reported that he was entitled to receive from this fund, only the proportion of eighty-eight dollars and fifteen cents, arising from the house, No. 12.

*C. & J. Remington,* claimed the sum of one hundred and ninety-seven dollars and ten cents, for lumber furnished for seven of the

(Pennock *v.* Hoover and Myers.)

houses, viz. 2, 3, 4, 9, 10, 12 and 13.   The last entry in their books was dated September 25, 1829.   Their claim, which was filed separately against the seven houses, was entered on the 12th of March, 1830, consequently, within the six months.   The auditor reported, that the sum of one hundred and ninety-seven dollars and ten cents, was due to them, to be paid, *pro rata*, out of the seven houses stated.

A schedule annexed to the report, showed the amount which each house ought to pay towards the respective claims.   From the statement of the auditor, a balance appeared of the proceeds of Nos. 13, 14 and 15, after satisfying the claims of the mechanics and material men, amounting to three hundred and fifty-five dollars and ninety-three cents, which was appropriated to the judgment creditors.

Exceptions were filed by *Samson* and *Wittman's* assignee judgment creditors of *Myers*, because the auditor allowed the claims of the mechanics and material men, inasmuch as the work done and materials furnished, were done and furnished for the whole of the houses, or a portion of them, more than one, indiscriminately and generally, and not upon the credit of each house separately.

*Thomas* excepted, because his claim on houses, Nos. 13, 14 and 15, was refused on the ground that the buildings were not sold within two years from the commencement of the building, taking the original commencement, and not the resumption after the new contract of *Myers*.   The commissioners of Kensington excepted to the refusal of the claim for paving.

The lien creditors excepted, and filed the following exceptions:

First.  The auditor erred in determining that the eighteen houses or any of them, upon which the money in court has been made by the sheriff, were not sold within two years from their commencement.

Second.  The auditor erred in rejecting the claims of several of the lien creditors, upon the ground, that no sale had taken place within two years, from the commencement.

Third.  The auditor erred, in determining that there was but one commencement of all or any of said houses.

Fourth.  The auditor erred in dividing the property sold, into lots or parcels.   The whole being seized and sold as one, being incapable of division without prejudice to the lien creditors.

Fifth.  The auditor erred in allowing the whole of the fund arising from one portion of his division, to the judgment creditors, to the exclusion of the lien creditors.

Sixth.  The auditor erred in allowing any portion of the fund in court to the judgment creditors.

Seventh.  The auditor erred in fact and law.

*Thorn* and *Remington* excepted to the report, that the auditor

erred in allowing any portion of the fund to the judgment creditors; in allowing three hundred and fifty-five dollars and ninety-three cents to the judgment creditors, and in not allowing *C. &. J. Remington* an apportionment on seven houses, instead of six.

*Jack,* for the lien ·creditors, contended, that the houses were all sold within two years from the commencement of the building. The date of the new contract with Mrs. *Penn's* agent must be consider-ed as a new commencement, the prior contract having been relin-quished. If a principal part of a building be torn down and re-built it is to be considered as creating a new lien. *The case of the Olym-pic Theatre,* 2 *P. A. Browne's Rep.* 284. The position now assu-med is fully sustained by the cases of the *Ins. Co.* v. *Pringle,* 2 *Serg. & Rawle,* 138, and *Hern* v. *Hopkins,* 13 *Serg. & Rawle,* 269. Each case must stand upon its own circumstances, and the equity of this case is strongly in favour of the lien creditors.

The apportionment of the lot made by the auditor is in the high-est degree unjust to the lien creditors. The lot subject to the ground rent had no value independent of the eighteen ·houses. The ground formed no constituent part of the proceeds of the sheriff's sale independently of the buildings. Only the right, title, and interest of *Myers* were sold by the sheriff, and *Myers* before that time had drawn orders for, and disposed of all his right in the remaining ground except about fifty feet on Perry street. The purchaser did not buy the legal estate. He bought only the equita-ble estate, and was to have the legal estate on completing the con-tract. *Auwerther* v. *Mathiot,* 9 *Serg. & Rawle,* 397, decides that the purchaser buys only such title as the defendant had at the time. Here only the right, title, and interest of *Myers* were sold—and when a judgment creditor sells in this way, he shall not be permitted to come in and say that the property is capable of division, particu-larly when he becomes the purchaser. The cases of apportionment sanctioned by the court, have uniformly been for the benefit of the lien creditors, as in the case of the *Olympic Theatre* before referred to, and *Werth* v. *Werth,* 2 *Rawle,* 151.

As to joint liens the mechanic has a lien on all and every building on the credit of which the work is done. This lien may be perpet-uated by filing a claim or bringing an action within the period prescribed by the act of Assembly. Take the case of an action. It surely could not be necessary for the mechanic to bring eighteen separate suits for the debt, and the court would consolidate them if so brought. Under his judgment he may issue execution and levy on the whole and sell the whole for the debt. It certainly could not have been intended that the remedy by action, should be more extensive or efficacious than that on the claim filed.

*Wheeler,* for *George Thorn.*—Joint liens are good. The act under which we claim is that of 17th March, 1806, and its supplement passed 28th March, 1808. The act applies only to the city and

(Pennock *v.* Hoover and Myers.)

county of Philadelphia; subsequent acts have extended it. But wherever extended, it has an aspect, especially to towns and villages, where rows of houses were liable to be raised: the words, " house or other building," &c. only are used : nothing is said about land. *Browne* v. *Smith*, 2 *P. A. Browne's Rep.* 229, note, is the first decision known of a lien carrying even a city lot ? The act received something like a supplement by the decision, *Werth* v. *Werth*, 2 *Rawle*, 151, where the auditor ascertained by his own judgment, the proper amount of land to accompany a barn.

·*From the situation of things at the time of passing the law.* Owners of ground had got to building largely : they often became bankrupt, to the injury of mechanics and material men. This was denounced. A prior act, viz, one passed in 1803, entitled " an act securing to mechanics and others payment for their labour, and materials, in erecting any house or other building, within the city of Philadelphia, the district of Southwark, and the township of the Northern Liberties" was intended to meet the evil; but was found deficient. It was found that owners, by putting forward architects, could evade the law. *Steinmetz* v. *Boudinot*, 3 *Serg. & Rawle*, 541. The act of 1806 declared liability whether the owner showed himself or not. In the period from 1800 to 1806, labour and materials were asked for on a wholesale scale and were *had*. These laws emanated from Philadelphia, where evils prompting to them were seen and felt.

*The provisions were intended to be ample.* The mechanic or material man need not inquire who is the owner of the lot, or what may be his interest in it. *Savoy* v. *Jones*, 2 *Rawle*, 343,—need not trouble himself about the inquiry whether the lumber goes into the building or not, if he honestly furnished for the building. *Hinchman* v. *Graham*, 2 *Serg. & Rawle*, 170. They have their lien from the commencement of the building. In the *Am. Fire Insurance Company* v. *Pringle*, 2 *Serg. & Rawle*, 138, the owner paid as he went, and when he had got his house partly finished, he sold : taking a mortgage. The purchaser went on, and finished, and in finishing, he left debts unpaid. The material man filed a lien; and the court decided that as the lien takes its station from the commencement of the building, the mortgage should be postponed. The claimant need not be of any employment or trade enumerated. *Savoy* v. *Jones*, 2 *Rawle*, 243.

The act of 1806 provided no specific remedy for the sale of the property affected by the lien. The legislature may have thought that if a lien should merely be attached, it would work a remedy for itself.

*The practical construction was in favour of joint liens.* By examination of the records of the Common Pleas of Philadelphia, it appears, that the number of houses intended to be affected by joint liens, is as great, as the number intended to be affected by separate liens. The records more particularly examined have been those between 1803 and 1806. The case in 2 *Browne*, 229 ; and *Knorr* v.

(Pennock *v.* Hoover and Myers.)

*Elliott*, 5 *Serg. & Rawle*, 49, were both litigated cases, and cases of joint liens; but no exception was taken on.that account.

*From the phraseology of the act.* Plural words are used in the act of 1806 and its supplement, of 1808. The legislature begin with a plural word, and drop the plural only when awkward, and then resort to it as soon as they can without awkwardness. The greater part of the act of 1806 is employed with checks and provisos; and the whole of the second section of the second act is employed about the remedy, yet there is no restriction against joint liens.

A lien must have its foundation in a contract. If the contract is for materials for.six houses, how can separate liens be maintained? If a lien has its foundation in a contract, then what is to prevent an, owner of ground, from making such a contract as may involve the . liability of his land? *Gorgas* v. *Douglass*, 6 *Serg. & Rawle*, 512, does not decide this case. The construction we ask for, is on different facts. There,is the case of fixtures, admitting of different constructions upon the same lease, as between landlord and lessee; and heir and executor. On the same expressions in a will, in favour of a child, interest will be allowed for maintenance, and disallowed to a stranger. *Fearne on Contingent Remainders,* 477; different construction on the same words, as to real and personal estate. As to the argument against joint liens from inconvenience, it is not known that those for whose benefit the law was made, complained. One of several houses can be freed by a release, as is daily done in relation to judgments and mortgages. As to the objection of different commencements of a joint lien, by reason of the houses having different dates of beginning, there is the familiar case of a mortgage covering land· in different counties; which binds according to the different dates of recording.

As to that part of the auditor's report, which throws off a part of the fund set aside for the lien creditors, and gives it to the judgment creditors, there is clearly error. The act prescribes liability for debts, &c. The liability of houses is like the liability of partners; each to the full extent of the debt, or like a judgment against several houses, entitled to full payment out of any one.

*Miles* for the judgment creditors, argued against the joint liens. The act of 17th of March, 1806, securing to mechanics, &c. is an innovation, and must be construed strictly. A latitude of construction will work great mischief to third persons. The ordinary rules for the construction of statutes should decide this point. We gather the intentions of the legislature, first from the *words* of the act, which confine the lien to " every dwelling house"—"other building "—" the building "—pursuing throughout as to the object of the lien, language indicating a single building. The *spirit* of the act renders the subject more clear. It was to make each individual house responsible for *its own* workmanship and materials. This principle was settled in

(Pennock *v.* Hoover and Myers.)

*Gorgas* v. *Douglass*, 6 *Serg. & Rawle*, 512; although the case there was of several houses owned by *different* persons; yet the houses were built together, and the materials furnished indiscriminately to all, and this is confirmed by *Savoy* v. *Jones*, 2 *Rawle*, 343, where the Chief Justice speaks of "credit to the building." But the safest guide for construction is to look at the *mischief*, as it existed at the passing of the act, and the *remedy* intended to be provided; from thence will be perceived the injurious *consequences*, which would flow from a construction opposite to that contended for. The reasoning in *Gorgas* v. *Douglass*, applies with full force to this case. The *lien* is created by the act of furnishing *on the credit of the building*, not by the mere filing a claim of record. *Hinchman* v. *Graham*, 2 *Serg. & Rawle*, 170. Now in *Gorgas* v. *Douglass*, the Chief Justice said, that the argument, as to the inconvenience to the material man of keeping a separate account was futile, because he was bound to make inquiry and understand the nature of the credit. So the object of the act was to benefit mechanics who built houses for sale, by giving such a lien only as would not "obstruct the sale;" *ibid*. Now the builder cannot sell one out of twenty houses, where the one is burdened with the debts of the whole, and the lien being *joint*, the material man cannot facilitate the sale, by relieving the one house; for a release of a part, is a release of the whole; the lien cannot be severed, without the agreement of all parties interested, which is impracticable. Again, the court said in *Gorgas* v. *Douglass*, that a joint lien would be injurious, "because it would not be known what proportion each house was to bear:" and this objection is a serious one, when as is frequently the case, many houses of different sizes, value, cost, and qualities of workmanship, are run up together. The construction we contend for, therefore, can be of injury to no one, if the law be so settled, while on the other hand, great mischief will ensue. It is a settled rule, that statutes shall be so construed as that all their parts shall be consistent if possible, *consonant to equity, and least inconvenient. Vaughan*, 38. 285. *Kerlin's Lessee* v. *Bull*, 1 *Dall.* 178.

*Stroud*, for *Pennock*, and *Boyd & Dehaven.*

Under the laws which have been enacted for securing to mechanics and others, payment for their labour and materials, there cannot be a joint lien. In *Gorgas* v. *Douglass*, 6 *Serg. & Rawle*, 512–21, it was held that a joint claim for materials, could not be filed against several houses owned by *different* persons, although the houses adjoined each other, were built at the same time, and by the same contractor, who was owner of one, and agent for the owners of the others. Two cases precisely similar to the present, afterwards arose in the District Court for the City and County of Philadelphia, where joint liens were filed against contiguous houses, belonging to the *same* persons; and the liens were declared invalid. See *Atkinson* v. *Graves*, *Whart. Dig.* 548, C. no. 37.

The question depends on the construction of the act of 17th March, 1806. If we regard the letter of the act, a lien is given against *each* building for the labour and materials expended in its construction. The section begins with " all and every house or building" in the singular; and the same words are repeated four or five times in the section. In reference to this feature of the act, the late Chief Justice in *Gorgas* v. *Douglass,* uses this language. "When it is said that ' all and every dwelling house,' &c. it would seem that *each* house was to be ' subject to the payment of its own debts;'" and again, " the expressions of this act are so far from being in favour of a joint lien, that they must be twisted and tortured to make them bear the appearance of it."

But if we regard the spirit of the act, its obvious scope and purpose; we shall find yet greater reason to confine the lien to the particular house, in the erection of which the labour and materials were expended.

What is the foundation in point of principle, of the enactment? Is it not, that every building, being supposed to be fully worth what it cost to erect it; and the lot on which it is erected, enhanced in value in exact proportion to the expenditure bestowed on the build-ing; it is reasonable and just, to give a preference of payment out of the property, to those who have so enhanced it. But the doctrine of joint liens, is entirely destructive of this equitable principle.

One house may be much larger, and cost proportionably more than the other, or from a variety of circumstances, such for instance, as its peculiar situation, one lot may be much more valuable than the other. If a lien can be acquired for labour, or materials expen-ded indiscriminately on all, without reference to the actual enhance-ment of each, the reason of the law is lost sight of, and its symmetry destroyed. If the argument *ab inconvenienti* is entitled to weight, it applies with great force in the case of joint liens. It is every day's occurrence, that from over estimates of the architect, and a variety of causes, the builder is disappointed in the cost of his build-ing. When this is the case, and several houses are erected at an expense, perhaps more than double what was considered a safe and liberal calculation, and the mechanics and material men become impatient for their demands; it may be the interest and within the power of the owner, to discharge the liens on one house, and thus place it in the market without incumbrance, and render it avail-able for the relief of the other house. In this way the sacrifice at a sheriff's sale may be averted. But where, as in the present case, the number of houses is greater, the inconvenience of joint liens is more obvious, because infinitely more disastrous. Here the amount of liens may be presumed to be eighteen times the value of each house, supposing all to be of equal size and value. A sheriff's sale is the inevitable consequence, if the builder have not the means of defray-ing the entire cost of the whole.

(Pennock *v.* Hoover and Myers.)

But the owner is not the only person who suffers from the joint lien.    Judgment creditors and mortgagees are subjected to the same hardship; the same necessity of loss by the known depreciation attendant on a sheriff's sale.

There is yet another consideration arising from the provisions of the act, which would seem to put the question of construction at rest.    The date of the liens relate to the *commencement* of the building, and by express enactment take precedence of any other lien, originating subsequent to that period.

Now on the doctrine of joint liens, however great may be the number of the houses, there can be but one commencement.  Suppose the owner of a square of ground should design to cover it with a row of houses, and commence with excavating the cellar of a house at one extremity of the square.    Would a person loaning money on mortgage, on a lot at the other end of the square, incur the hazard of a preference by the lien creditors?    Yet to this extent, the advocates of the joint lien are carried.    We had contracted, say they, to furnish materials for the row.    The buildings were therefore *commenced* before you obtained your mortgage.    It is obvious that such reasoning, though fairly deducible from the doctrine of joint liens, when carried to its full extent, is utterly incompatible with the security requisite for the ordinary transactions of business.    No degree of vigilance could protect any one from being entrapped. No public record is made of the time when a building is begun. The only evidence is a visible demonstration on the premises.  Hence it is the practice to go to the property, and see if any building is there erected, before a mortgage is taken.    This however, is no protection, if joint liens are tolerated.    Can it be supposed then, that the legislature ever meant the law to be so construed.    Again, the act provides, that the debt shall not remain a lien longer than two years, from the *commencement* of the building, unless, &c. Now, it may be asked whether the lien on the last of a series of houses, terminates in two years from the time the first was begun. If the lien be joint, the answer must be in the affirmative.    Yet it is easy to perceive, how disastrous in its consequences such a doctrine would be, to the very individuals it was intended to benefit. In short, joint liens are in no case convenient to the mechanic.    The material man alone desires them, and he not for his protection, but for his ease to lessen his labour, but not to secure his rights.    In addition, it may be said, that the provision of the act in relation to the entry of satisfaction, at the instance of any person interested in the building, on payment of the costs of office, &c., evidently confines the lien to one building; the costs are of *one* claim, *one* action.

The opinion of the court was delivered by

Kennedy, J.—In this case, the sheriff after having sold the real estate of the defendant, consisting of a parcel of ground and eighteen

unfinished houses, under a writ of *venditioni exponas,* issued at the suit of the plaintiff, brought the money arising therefrom, at the return of the writ into court.   Upon this being done, an application was made, to have the money distributed among the creditors, whose claims were liens upon the property at the time of the sale, accor- ding to their respective dates of priority.   For the purpose of facili- tating this object, an auditor was appointed by the court, to examine into, and ascertain the nature, amount, and date of each of the res- pective liens, who accordingly made a report.   To this report a number of exceptions have been filed, involving questions of some difficulty as well as importance.

The claims made upon the fund in court, consist of ground-rents, taxes, corporation-assessments, judgments, and debts due to material men, lumber-men, and mechanics respectively, for materials furnish- ed, and labour performed in the construction of eighteen houses, or some part of the number, at least, all of which were designed for dwelling houses.

The first question presented by the exceptions to the report is, whether the auditor be right as to the time, when the building of the houses, Nos. 1, 2, 3, 13, 14, and 15 were commenced; or perhaps, more properly what is meant by the terms "commencement of the build- ing," as used in the proviso to the first section of the act of assem- bly, of the 17th of March, 1806, entitled, "an act, securing to mechanics and others, payment for their labour and materials, in erecting any house or other building within the city and county of Philadelphia," which declares "that no such debt for work or mate- rials shall remain a lien on the said houses or other buildings, longer than two years from the commencement of the building thereof, unless an action for the recovery of the same be instituted, or the claim filed within six months after performing the work, or fur- nishing the materials, in the office of the prothonotary of the county," &c.

On this question we think the auditor is correct, and that his opin- ion is fully sustained by the construction given to this act, and the doctrine laid down by this court in the *American Fire Insurance Company* v. *Pringle,* 2 *Serg. & Rawle,* 138, and afterwards in *Hern & Co.* v. *Hopkins,* 13 *Serg. & Rawle,* 269.   The houses in the case before us, were from the beginning of the work on them to the end of it, intended for dwelling-houses, and with that view, the building of them was commenced in the spring of 1829, by different persons, who expected to be the owners of them, and as such began the work, under contracts made with *Warnet Myers,* for the purchase of the ground upon which they respectively commenced the building of them. *Warnet Myers,* however, not being the legal owner of the ground himself, but having the possession of it merely under an agreement with the legal proprietor for the purchase thereof, and failing to comply with his agreement, never did become the legal

owner of it.   On the 16th of June, 1829, having become insolvent, he made an assignment of all his estate and effects to trustees; who on the 15th of August following, surrendered all right which *Myers* had under his contract, for the purchase of this ground, to the legal owner thereof.   About the beginning of June 1829, those persons who had previously commenced the building of six houses, Nos. 1, 2, 3, 13, 14 and 15, under their respective contracts with *Myers*, for the purchase of the ground, quit working at them, and abandoned them, after having dug out and walled up the cellars.   On the same day that *Myers's* trustees surrendered the first contract, which he had made for the purchase of the ground, he by *Samuel Hoover*, who acted in trust for him, made a second contract, upon the same terms as the first, with the legal owner for the purchase of it.   Immediately after this, *Myers* procured materials, employed mechanics, and with them resumed the work of building the six houses, making some slight alteration in the foundation of them, but still intending them for dwelling-houses, according to the original design, and at the same time commenced the building of twelve others, the residue of the eighteen houses already mentioned.   By the terms of the act of assembly before in part recited, the liens thereby given to mechanics and material men, are made to commence expressly from the commencement of the building of the houses, without reference or regard to the person or persons under whose direction or ownership of the property they are begun, continuing to be the same, at whose instance the materials from time to time, shall be furnished and the labour performed throughout the subsequent stages of the work, until finished.   It is not the commencement of the right of ownership or claim to the property, nor yet the time at which such right may be first exercised, in contracting for materials, and with mechanics, for the purpose of continuing the building, that is to fix and regulate the commencement of the liens, on behalf of those furnishing materials, and performing the work; nor is it the time of furnishing the materials, or the time of commencing or finishing the work, but the time of commencing the building of the house, that gives date to the lien.   Now, in point of fact, as long as the design or use, for which the house is intended, shall continue to be the same, a change of ownership after the building of it has been commenced, does not, and in the very nature of the thing itself, cannot, change the commencement of the building of the house: that must still continue to be the same, notwithstanding the right of property in the ground and the house begun upon it, shall have been changed subsequently, and passed through twenty or more different hands.   Neither is it easy to conceive, how a change made in the plan of the house, after it has been commenced, by enlarging or contracting, or in any other respect changing the plan of it, as long as the original design of its character is retained, can with propriety be said to change or give a new commencement to the building of it.   And the act of assem-

(Pennock v. Hoover and Myers.)

bly of 1806, certainly contains nothing, which in the slightest degree militates against what I think may be safely considered the universal understanding as to what constitutes the commencement of the building of a house; and that is the first labour done on the ground, which is made the foundation of the building, and to form part of the work suitable and necessary for its construction. Indeed the act seems to require this construction, in order to carry into effect the intention of the legislature, which is the main thing to be attended to in expounding it. That this construction is the most favourable for those who shall furnish materials, and perform work, in the erection of houses, for whose security and advantage, the act was exclusively designed, can admit of no doubt : for, they thereby gain a preference over all other liens, of posterior date to the commencement of the building, although prior to the time of furnishing the materials, or even contracting for them, and of performing the work. The words of the act in relation to this point, are, " all, and every dwelling-house and other building, &c. shall be subject to the payment of the debts contracted for, or by reason of any work done, or materials found and provided, by any brick-maker, brick-layer, stone-cutter, mason, lime-merchant, carpenter, painter and glazier, ironmonger, blacksmith, plasterer, and lumber-merchant, or any other person or persons, employed in furnishing materials for, or in the erecting and constructing such house or building, before any other lien, which originated subsequent to the commencement of the said house, or other building." This preference can only be lost through the neglect of the party, or a determination on his part not to avail himself of it. If he neglect or will not institute an action for the recovery of his claim, or otherwise file the claim itself in the prothonotary's office of the county, within six months after performing the work, or furnishing the materials, it will cease to exist, according to a provision contained in the act, in two years from the commencement of the building, so that if any loss shall accrue to him, from not having instituted his suit or filed his claim within the six months, as required by the act, he may be said to have occasioned it himself, and the maxim *volenti non fit injuria* will apply.

The next question arising out of the exceptions, is, can the same debt, contracted for, or by reason of any work done, or materials found, and provided by any brick-maker, brick-layer, stone-cutter, mason, lime merchant, carpenter, painter or glazier, ironmonger, blacksmith, plasterer, and lumber-merchant, or any other person, or persons employed in furnishing materials for, or in the erecting and constructing of two or more dwelling-houses, or other buildings, adjoining to each other, and belonging to the same person, become a lien under the act of assembly already mentioned, and its supplement of the 28th of March, 1808, against all such houses or buildings ? This question is left undecided by the case of *Gorgas* v. *Douglass*, 6 *Serg. & Rawle*, 512. The court in that case only deci-

(Pennock *v.* Hoover and Myers.)

ded, that the act of 1806, did not authorize a joint claim to be filed, against three adjoining houses, belonging to different persons, for materials furnished, for the building of them.    Chief Justice Tilgh-man, who delivered the opinion of the court, says, " we are not to decide on this occasion what would be the law, if one man shall put up several houses, all his own property, at one time.    The case is of three houses owned by three persons."    And again he repeats, " I give no opinion on the case of several houses owned by one person."

Although in drawing up the act of 1806, grammatical form does not appear to have been strictly attended to, and it may be that the words employed in the beginning of the first section, would rather seem to indicate an intention that each house or building should only be liable for such work as was done in the construction of it, and for such materials as were either specifically furnished for the building of it, or otherwise actually used for that purpose, yet I am inclined to believe that the intention of the legislature when collected from the whole of the act of 1806, and its supplement of 1808, was, to give the party who furnished materials generally, for the construction of two or more houses belonging to the same owner, without knowing how much of them was intended for each particular house, or who performed labour in the construction of them under one entire contract generally, a joint lien upon all the houses according to the full extent of the contract.

The effect of the opposite construction, which is contended for in this case by the judgment creditors, would be, that whenever a material man makes an entire contract to furnish the same owner with all the materials necessary to construct two or more houses, for a certain sum of money, or at certain rates, or a mechanic agrees for a gross sum of money to do all the work necessary for the construction of them, neither would have a lien upon the houses, or any of them, as a security for the payment of his claim after the materials shall have been found and the work done.    For having made an express contract, each party must abide by it; and if the material man or the mechanic in such case, bring a suit within the six months after having furnished the materials or done the work, it is clear, that having made but one contract under which he was to be paid a gross sum of money upon the delivery of the materials or performance of the work, he can only sustain one action in which he can obtain but one judgment, which must be for the whole amount of his claim; or if instead of bringing an action to perpetuate his lien against the houses, he files his claim in the prothonotary's office within the six months, he must still have regard to the terms of his contract, which makes his claim entire and incapable of division. He can therefore file but one claim, which must be for the whole amount of it against all the houses jointly, otherwise his contract would not support or correspond with the claim filed, which would be an insuperable objection to his recovering in a writ of *scire facias*

(Pennock *v.* Hoover and Myers.)

sued out on it, according to the principle laid down in *Gorgas* v·
*Douglass*, 6 *Serg. & Rawle*, 521–2.   It necessarily results then in
this, that the lien under the acts of 1806 and 1808, must be joint
upon all the houses in such case, or otherwise there can be no lien
at all.   Against such a lien being created by these acts, it is con-
tended first, that it is contrary to a strict grammatical construction
of them.   And again, that great inconvenience as well as injury
would necessarily arise to the owner of the houses, who might
thereby be precluded from selling any one or more of them without
he could obtain a sum sufficient to discharge the whole amount of the
lien.   Whereas, if each house or building is made liable only for the
proper expense of its construction, the owner may often have it in
his power to sell the whole number consecutively for a much larger
sum of money than the amount of the liens upon all; or to sell a part
for a sum sufficient to discharge the liens upon all, and to retain the
residue; but if he be compelled to wait until he can sell at once as
much of the property as will be sufficient to satisfy the aggregate
amount of the liens, he may not happen to meet with a purchaser or
purchasers at the same time who are willing to buy so largely, and
finally he may have it sold for him, or otherwise be compelled to sell
it himself at a great sacrifice.   Doubtless such inconvenience may
occasionally take place; but the owner of ground who wishes to
have houses or other buildings put upon it, has it in his power if he
chooses to guard against such inconvenience in making his contracts
for materials and labour to be employed in the construction of his
houses.   It is only necessary for him to make a separate contract
for the building of each house, or to introduce a clause into a con-
tract for the whole, that each house shall be charged for separately
and liable only for the expenses of its construction, and the lien
under the act will follow the nature of the contract.   But where the
owner is induced to avoid this course because he discovers that he
can obtain materials and labour for building his houses at much less
price by making an entire contract for the whole, than he could by
making a contract for each house separately, why shall he not be
permitted to judge for himself in this particular and to act accord-
ingly?   It is plain that it was not the intention of the legislature to
interfere in the least with the exercise of such a right.   And although
it is possible that a man may in some instances err in judging for
himself in such a case, yet in most cases, if not in all, it will be
found more safe to leave it to himself to judge of; because it must
always depend upon circumstances best known to himself, whether
one contract for the whole or a separate contract for each house will
be most likely to promote his interest the best.

The objection that a joint lien is in opposition to the grammatical
construction of the act is perhaps not very clear; but even if it
were, it ought not to prevail where it would militate against the
meaning and intention of the legislature, as collected from the whole

of the act, and against that construction which gives to every word, clause and sentence, a pertinent and useful effect, instead of rendering some of them inoperative. It is said, that because the act declares that "every dwelling-house or other building (thus using the singular number) shall be subject to the payment of the debts contracted" for the building of it, the lien created by the act is for the expense of building it alone and not for that of others; and for the same reason the expense of it with that of others cannot become a joint lien against the whole, although it be but one debt growing out of one entire contract made for building all the houses together. This alone perhaps in almost all cases without other words or expressions being used, would be deemed insufficient to denote severalty, and at the same time to exclude plurality. For even in the construction of penal statutes, where the rule is, that they shall be taken strictly, the use of words in the singular or plural number, is sufficient to embrace objects indiscriminately either in the plural or singular number. As if it be enacted, that he who steals a horse shall not have the benefit of clergy; it could not be pretended, that if he at the same time stole more than one horse, his offence would not come within the act. So the burning of a *dwelling-house* has been always held to come within the provisions of 23 *Hen.* 8, cap. 1, although the plural "dwelling-houses" are the words used in that statute. 2 *Hale, P. C.* 365. But the meaning of the legislature is the first and great object to be sought after in expounding their acts; and where the words employed are dubious, the most universal and effectual way of getting at it, is by considering the reason and spirit of the act, or the cause which moved the legislature to pass it. 1 *Bl. Com.* 61. Observing this rule, in connection with one or two others, which require the subject-matter and the words of the act throughout to be particularly attended to, we may arrive at a pretty correct conclusion as to what it was that the legislature intended. It is obvious, that the reason of passing the act of 1806 was to secure, as far as practicable, to material men and mechanics, payment for materials furnished and labour performed by them respectively in the construction of dwelling-houses and other buildings, by making the houses and other buildings subject to the payment of the debts thus contracted, and creating the same a lien upon the property until paid. Now it is well known to every one conversant with this subject, and we must take it for granted, that it was known also to the legislature at the time that they passed the act, that material men and mechanics engaged in putting up houses in the city and county of Philadelphia, had long before that been in the habit of making with the owner of the ground a single contract to furnish materials sufficient for the building of several adjoining houses, in consideration of a certain sum of money or certain prices for the materials, according to their nature and the quantity delivered, to be paid for the same, and a like contract

for doing the work thereof.   And it is certainly not unreasonable to suppose that inability to pay occurred at least as often, if not more frequently, in such cases, and to a much greater amount than in cases of contracts for the building of a single house only, and that the remedy provided by the act must have been intended by the legislature to extend to the greater evil as well as the less.   If the legislature, knowing that contracts by the same person to deliver materials sufficient for the building of several adjoining houses, belonging to the same owner, or to do the work thereof, were common, had intended to exclude them from the operation of the act in favour of the material men and the mechanics, and that debts arising under such contracts should not become liens upon the houses for which the materials were found, and upon which the labour was performed, is it not reasonable to believe that they would have employed terms very different from those used?   How is it possible with such an intention that they could have directed as they have done, in the close of the second section of the act of 1808, which is in these words, " provided, that no *judgment* rendered in *any scire facias* shall warrant the issuing *an execution,* except against the building or *buildings* upon which the *lien* existed *as aforesaid.*" Thus showing, by necessary and irresistible implication, that the legislature were of opinion, that under the provisions of the acts of 1806 and 1808, a claim might exist and be filed as a lien upon more buildings than one, upon which a single writ of *scire facias* might be sued out, one judgment only obtained, upon which an execution might be issued against all the *buildings* upon which the *lien* existed; but lest it might be thought that an execution could be issued upon such judgment against other buildings than those upon which the lien existed, they thought proper thus expressly to prohibit it.   It is said, however, that this provision is, contained in a proviso, and therefore ought not to have an influence upon the enacting parts of the acts.   But in the *Attorney General* v. *The Governor and Company of Chelsea Water Works,* it was held, that where the proviso of an act of parliament was directly repugnant to the purview, the proviso should stand and be a repeal of the purview, as it *spoke the last intention of the makers.    Fitzgibbon, Rep.* 195.

Seeing then that it was a common practice with material men and mechanics, before the passage of the act of 1806, to make one entire contract with the owner of the ground, to furnish materials for, and to perform the work of building two or more houses for a certain sum of money, or at fixed rates, and it occasionally happened that their employer after they had furnished the materials and performed the work, was unable to pay them, and his property, during the interim, including the houses they aided him in building had became incumbered beyond its value, it may be very rationally and fairly inferred that such cases formed at least a part of the mischief that was intended to be remedied by the passage of the acts

(Pennock *v.* Hoover and Myers.)

in · question: and being also inclined to think that the words and various expressions of the two acts when viewed and taken all together, embrace and provide for such cases, I am necessarily brought to the conclusion, that the material-man who furnishes at the request of the owner, materials for the building of two or more houses generally, without any special contract, or under a contract to furnish whatever may be necessary to complete the whole number at a fixed sum, or according to certain rates, or the mechanic who in like manner, performs work in putting up the houses, acquires a joint lien for the amount of the materials found or the work performed upon all the houses.    That such has been the opinion of the most eminent counsel in the state, may be fairly inferred from *Knorr* v. *Elliott*, 5 *Serg. & Rawle*, 49, in which Mr. *Binney* appeared for the plaintiff, and Mr. *Chauncey* for the defendant.    There is no statement of the case given, except what is contained in the opinion of the court, delivered by the late Chief Justice; who says, " the plaintiff obtained a *lien* on certain *houses* now belonging to the defendants, for materials furnished by him for the building of the said *houses*.    The plaintiff's *claim* was filed in the office," &c.    The claim and the lien are both spoken of in the singular number, and the houses in the plural; so that it is manifest there was but one claim and one lien, which was admitted to have had an existence at one time upon several houses under the operation of the act of 1806, but was opposed then on the ground that as no *scire facias* had been sued out upon it within five years from the time it was filed in the prothonotary's office, the lien was extinguished by the act of the 4th of April, 1798, which limits the liens of judgments to five years unless revived by *scire facias.*

So I also think, that where the lumber-merchant furnishes materials for, or the mechanic does work, in the construction of two or more contiguous houses, belonging to the same person, under a general request, without any specific contract for each house separately, that he may under the acts of assembly, either file his claim for the amount against all the houses jointly, or he may apportion it among them according to the value or price of the materials furnished or the work done to each, and file his claim accordingly against each house separately, and thus continue his lien in either form.

There being nothing then, as I conceive, in the acts of assembly, which restrains the parties from including in the same contract, materials for, and the work of as many contiguous houses as they please, it would seem to follow that the nature and terms of it, together with the work done under it, ought to regulate the operation and extent of the lien.    Hence it would extend itself to all the houses or buildings actually commenced, for which the materials were furnished or work done under the same contract, and would become a joint lien for the whole amount of the debt, commencing on each house with the commencement of the building thereof.

(Pennock *v.* Hoover and Myers.)

This appears to be not only the most obvious as well as safe and certain rule or guide, by which the nature and the extent of the liens of material-men and mechanics may be determined, but the best suited to give to those persons, that degree of security for the payment of their respective debts, which was intended by the legislature. In its operation and effect, it may be fairly likened to the lien of a mortgage, given to secure the repayment of money borrowed, upon a number of different tracts of land, say eighteen in all, lying in as many different counties of the state. The lien under it would commence, and the whole amount of the debt become a charge upon each tract from the date of the recording of the mortgage in the county in which each tract was situated; and as it would scarcely be practicable to have the mortgage recorded in any two of the counties on the same day, the date of its lien on each tract of land would vary accordingly, but as soon as recorded in all the counties, the mortgage-debt would become a joint lien upon all the eighteen tracts of land embraced in the mortgage. And if in such case afterwards, while other liens existed on the mortgaged lands, some of prior, some of even, and others of subsequent date to that of the mortgage lien, a judicial sale were to be made of all the lands under a proceeding had upon the mortgage for that purpose, and the moneys arising therefrom prove insufficient to pay off all the liens, the rule for appropriating it in such case according to seniority of lien could not well be misapprehended as it must be familiar to all.

The next question raised by the exceptions to the report of the auditor is, whether under the acts of 1806 and 1808, the ground upon which the houses are built, can be divided and apportioned among them so as to allow to each only such quantity of ground as is usually occupied with, and necessary for the enjoyment of houses in a similar situation of like dimensions, and built upon the same plan? Upon this point I consider the opinion of the auditor correct, and in perfect accordance with what appears to me to be a reasonable interpretation of the acts of assembly. Against his opinion it has been argued, that as the whole of the ground formed the subject of but one purchase, and consisted only of one parcel, without any subsequent actual division being made of it by the purchaser, it was not competent for the auditor to make a division of it, or of the money arising from the sale of it. Now in respect to this, it may be observed, that by a *literal* construction of the act of 1806, it may be made a question, whether the lien can be extended beyond the ground actually covered by the house or building; because by the words of the act, it is the *house* or *building* that is made subject to the payment of the debt, and no mention whatever is made even of the land or ground upon which it stands. It is therefore only by a liberal, or perhaps more properly speaking, a reasonable construction, that the lien created under this act can

(Pennock *v.* Hoover and Myers.)

be made to embrace any land not covered by the buildings. And although it may be necessary, in order to carry into effect, what seems to have been the intention of the legislature as manifested throughout the act, to extend the lien to land beyond what may be covered by the buildings, yet there must be some reasonable limit in this respect; and here it appears to me that the purpose of the legislature will be fully satisfied by extending the lien beyond the ground covered by the buildings, to as much more as may be necessary for the convenient occupation and enjoyment of them according to the intention and design of the owner at the time of their commencement. This would seem to be giving to the party all the security that was intended by the act; and any thing short of this would perhaps in most instances, render it very ineffectual.

In this case the auditor has made a division of the ground allotting to each house not only what would seem to be as much as is usually occupied as a curtilage to such houses placed in a similar situation of the county or city of Philadelphia, but all that the owner of the houses had intended should be used as appurtenant thereto, *according to* his plan of improvement as indicated by the work done upon the ground itself. In this I think he was right. The residue of the ground not being necessary to the proper occupation and enjoyment of the houses, remained of consequence unincumbered by the debts contracted in the building of them, but liable to the payment of the judgments which were liens upon it; to which the auditor has very properly appropriated the money arising from the sale thereof.

The next question which requires notice, arises out of the exception taken to the report of the auditor by the counsel for the Commissioners of the Kensington District of the Northern Liberties. By the first section of the act of assembly passed the 3d of February, 1824, *Purd. Dig.* 190, entitled "an act relating to taxes on real estate in the city and county of Philadelphia" it is enacted, that "all taxes, rates and levies which may *thereafter* be *lawfully* imposed or assessed to be applied for *any purposes* either in the city or *county of Philadelphia* on *real estate* situate in the said city and *county of Philadelphia* shall be, and they are thereby declared *to* be a *lien* on the said *real estate* on which they may thereafter be imposed or assessed, &c.; and the said *lien* shall have *priority* to and shall be fully paid and satisfied *before* any recognizance, mortgage, judgment, *debt*, obligation or *responsibility*, which the said real estate may become *charged with* or *liable to*, from and after the passing of that act." And by the 8th section of it, it is further enacted that, "all and singular the provisions of this act shall be deemed and taken to apply to the *taxes*, rates and levies imposed or *assessed* by authority of the city of Philadelphia or *any corporation* in the city or *county* of Philadelphia, upon *real estate* situate in the said city or *county*, except water rents, which may be imposed for

the use of the Schuylkill water, which shall not be considered as coming within the provisions of this act."

After this, by an act passed on the 19th of March, 1828, *pamphlet laws of* 1827-8, pages 190-1, the board of Commissioners of Kensington district of the Northern Liberties were empowered to pave all or any part of the foot-ways and gutters within the said district; and upon the application of a majority of the owners of the lots fronting on any street, road, lane or alley, to pitch and pave any such street, road, lane or alley within the said district; and to *tax* the *property* in front of such foot-way, street, road, lane or alley as should be paved, or pitched and paved, in proportion to the extent of the same in front. The Commissioners by the third section of this latter act are likewise authorised to recover the taxes assessed for pitching, paving and curbing in front of property unoccupied, or if occupied without sufficient personal property thereon to satisfy the same, in the same manner as county rates and levies in the county of Philadelphia are or thereafter may be by law recoverable; or to institute actions 'for the recovery of the said *assessments* before any tribunal within the state,' having jurisdiction of the amount claimed, against the owner, and to recover the same with legal interest from the time of making said assessments. Under this act an assessment amounting to seven hundred and fifty-one dollars and forty-eight cents was made on the 12th of October, 1829, to defray the expenses of paving on Second street below Masters street, in front of part of the property from the sale of which the money has been raised in this case. This assessment never having been paid, is claimed out of the moneys arising from the sale of that part of the property in front of which the paving was done. The auditor was of opinion that the assessment did not become a lien under the provisions of the two acts last mentioned upon any part of the property sold and therefore disallowed it. In this it appears to me he has committed an error. For the act of the 3d of February, 1824, declares expressly, that "*all* taxes, rates and levies which may *thereafter* be *lawfully* imposed or assessed to be applied to *any purposes* either in the city or *county* of Philadelphia *shall be a. lien* on the said *real estate* on which they may thereafter be imposed or assessed, &c. And that the said lien shall have *priority to,* and shall be satisfied *before* any recognizance, mortgage, *debt,* obligation or *responsibility* which the said real estate may become *charged* with or *liable to* from and after the passing of that act." And again, by the eighth section of it all its provisions are made applicable to taxes, rates and levies imposed or assessed by *any corporation* within the city or *county of Philadelphia.* Now the Commissioners of Kensington District of the Northern Liberties being a *corporation within* the *county of Philadelphia,* and the tax for paving having been *lawfully* assessed by them, it seems to me that it falls directly within the provisions of this act, and is thereby made a lien upon a

(Pennock *v.* Hoover and Myers.)

part of the property sold in this case, and must be paid before any other *debts* to which it was liable.

It it no objection to this tax being a lien upon the property upon which it was assessed, that the Commissioners of the Kensington District were not authorised to impose a tax for such purpose at the time of passing the act of 1824, because that act is prospective in its terms and makes *all* taxes which shall be thereafter *lawfully* assessed for *any purpose whatsoever* by any corporation in the county of Philadelphia upon real estate lying therein a lien on the same. So that it is sufficient under the provisions of this act to make the tax a lien, if the corporation had lawful authority to assess it at the time of doing so, and executed that authority in due form, no matter when it was granted. The act only requires that the tax, when assessed, shall be *lawfully* assessed in order to make it a lien, and in the case under consideration it is admitted that the tax for paving was *lawfully* assessed under the act of 1828, recited above, which is sufficient to make it a lien. The acts of 1824 and 1828 are in *pari materia* and to be construed as one act; and certainly there is nothing contained in the act of 1828 which alters or repeals any part of the act of 1824: neither can any good reason be assigned, as I apprehend, for making taxes assessed under an authority which existed at the time of passing the act of 1824 a lien upon the estate whereon they are assessed, that would not apply with equal force to taxes assessed under an authority granted subsequently.

But it is objected that by an act passed the 20th of March, 1830, *Pamph. Laws.* of 1829-30, page 122, the legislature have declared, "That all real estate within the Kensington District of the Northern Liberties, should be subject to the payment of the debts contracted by the commissioners of the said Kensington District of the Northern Liberties, for or by reason of any work done, or materials furnished, for, or in pitching, curbing, and paving any street or footway in front of said real estate, before any subsequent liens; provided, that nothing therein contained, should in any wise impair or affect such liens as were existing at the time of passing that act;" and that if such taxes had been a lien before, and at the time of passing this last act, it would have been unnecessary. The passage of this last act however, at most only proves that the legislature at the time, were not aware that all such taxes and assessments as are therein mentioned had been made liens by a previous act; and it cannot be sustained for a moment, that their mistake or misapprehension of the law in this respect, would make it different then from what it really was: or different from what it would have been in case this last act of 1830 had not been passed; for it repeals no part of the prior acts, so far as respects the making of taxes, lawfully assessed, liens upon the real estate whereon they are imposed. It is merely affirmative of them, and in effect declares that the law

(Pennock *v.* Hoover and Myers.)

in this behalf shall be the same, that it was before under their operation. The proviso in this last act expressly declares that nothing therein contained shall in any wise impair or affect such liens as *were existing* at the time of its passage. Seeing then that it is merely an affirming and not a repealing act, the prior acts on the same subject must receive the same construction, as if it never had been passed; and the lien created under them is preserved by the proviso of this last act. The assessment then of seven hundred and fifty-one dollars and forty-eight cents for paving, with interest thereon from the 12th of October, 1829, being a lien upon a part of the property sold, when the act of 1830 was passed, and expressly preserved unimpaired by this act, must be paid according to the terms of the act of 1824, before any "recognizance, mortgage, judgment, debt, obligation or responsibility," to which the property assessed was liable at the time of sale, and is therefore payable out of the money arising from the sale of that portion of the property in front of which the paving was done, and for which the assessment was made, before the debts of the material men, mechanics, or judgment creditors.

The claim of *George Thorn* requires now to be examined. It was for bricks furnished, and has been allowed by the auditor in his report. The amount thereof is three hundred and ninety-one dollars and fifty-two cents, and appears from the report to have been filed within the six months, against eight of the houses generally, without any description or designation by which it is possible to ascertain which eight of the whole number were intended. Under this uncertainty, the auditor thought it right to charge this claim or the *pro rata* proportion of it, upon each one of all the eighteen houses instead of eight only. This was clearly wrong, because it was charging the claim in part upon at least ten houses against which no claim was ever filed, or alleged to have existed at any time. And from the want of a proper designation of the houses mentioned in the claim filed, it appears to me to be void for uncertainty, and altogether insufficient to continue the original lien, whatever it might have been against any of the houses beyond the two years from the commencement of the buildings. But it is alleged that Mr. *Thorn* is able to show by proof the houses for which he furnished the bricks, and that the sale of the houses was made within the two years. If he does this, his claim to a proportion of the money will still be good; because that will show that the lien created in his favour by the act was in full force at the time of the sale, and certainly would have continued to be so until the end of the two years, had not the sale been made, without filing his claim in the prothonotary's office. The filing of a defective claim could not destroy the lien which he had at the time, though it would not have been sufficient to have continued it beyond the two years. As this case is to go back to the auditor, Mr. *Thorn* will have an opportunity of establishing his claim in the manner suggested; and if he does so, he will be entitled

to come in for a *pro rata* proportion of it, otherwise it must be disallowed.

The exception to the report of the auditor, on account of his appropriating three hundred and fifty-five dollars and ninety-three cents, the balance of the proceeds of the houses, Nos. 13, 14 and 15, after satisfying their *pro rata* proportion of the liens of the material men and mechanics, according to the principle adopted by him in stating his account, claims our consideration next.   The auditor, although of opinion that a claim for materials furnished or work done generally, without any specific contract, towards the building of two or more of the houses was good under the act of 1806, and that the party so furnishing the materials or doing the work, might at his election have either a joint lien against them all by filing his claim in that form, or a separate lien against each building for its due proportion of the materials furnished or work done, by filing his claim against each separately, yet thinking in the case of the claim being filed as a joint one, that each house or building embraced within it, was only chargeable with its aliquot proportion of the whole amount thereof, he has accordingly charged No. 14 or the proceeds thereof, with sixteen dollars and seventy-two cents, being only a small part of one of the claims of *Isaac Childs*, which was a joint lien upon No. 14, with two or three other of the houses; still leaving a considerable balance of it unpaid, and a surplus of the proceeds of No. 14, which is included in the three hundred and fifty-five dollars and ninety-three cents, and transferred to the payment of the judgments, being liens of a subsequent date.   Instead of doing this, it appears to me that the whole of this claim of *Childs* ought to be paid first out of the proceeds of No. 14, before any part of it shall be appropriated towards payment of the judgments or any other subsequent liens. The general rule is well settled, that liens upon real estate in this state, whether joint or several, must be satisfied out of the moneys arising from a judicial sale thereof, according to their seniority.

In further explanation of the principle here intended to be laid down, I would observe, that in case of a joint lien, each house or building bound by it, is liable for the whole amount thereof; and where there are other liens of equal date, some joint and others several, as in the present case, all of equal date, the money arising from a judicial sale of all the houses, must be marshalled and appropriated in such manner, that the proceeds of no one of them shall be appropriated to the discharge of any subsequent lien as long as any portion of a prior lien, either joint or several, upon the same house remains unsatisfied.

The auditor in his report shows the claim of *C. & J. Remington*, amounting to one hundred and ninety-seven dollars and ten cents, to be a joint lien on No. 13, and six other of the houses; but inadvertently, I presume, has omitted in schedule F. to apply any part of the proceeds of No. 13, to the payment of it.   This must be corrected

(Pennock *v*. Hoover and Myers.)

so as to allow to this claim a due proportion of the proceeds of No. 13, according to the principles already laid down.

It now only remains to notice what I consider an error in the manner of charging and allowing the claim of *Isaac Childs.* · From the report of the auditor, it appears that he had three several claims of eighty dollars and seventy-nine cents each, which were each charged jointly on three of the houses, and a fourth of ninety-nine dollars and fifty cents, charged on four of the houses. Each claim embraced houses different from that of every other, so that no one or more of the same houses were included in any two of the claims. These claims were each reduced something by the auditor, but then he seems to have charged the aggregate of the balance of them as one entire claim jointly, upon the thirteen houses embraced in the four several claims, instead of charging the balance of each claim separately upon the proceeds of those houses specified within it, and against which it was filed. This must also be corrected, or otherwise *Childs*, upon the principle laid down for adjusting and making distribution of the money among the several claimants, will receive more than his due proportion.

Excepting so far as error has been herein shown to exist in the report of the auditor, it is considered to be correct, but in order that the account and appropriation of the money may be stated and made according to the principles now laid down by the court, the case is referred back to the same auditor for that purpose.