## Case No. 15,915.

### UNITED STATES v. The OHIO.

[29 Leg. Int. 252; [1] 9 Phila. 448.]

District Court, E. D. Pennsylvania. Aug. 9, 1872.

SHIPPING — PUBLIC REGULATIONS — CANAL BOAT.

1. A laden boat, which, having no sail. oars, or other motive power of its own. is drawn. by horses, through a canal. and from thence, through navigable waters of the United States,

[1] [Reprinted from 29 Leg. Int. 252, by permission.]

by a steamer. to a market, is not within the description of a ship or vessel in the act of congress of February 18. 1793 [1 Stat. 305], "for enrolling and licensing ships or vessels to be employed in the coasting trade and fisheries, and for regulating the same."

[Approved in U. S. v. Pennsylvania Canal Boat Nos. 68 and 69, Case No. 16,027.]

2. The applicability of the act is not, in this respect, enlarged or altered by the act of July 20. 1846 [9 Stat. 38], exempting such canal boats without masts or steam power as were then by law required to be registered, licensed, or enrolled and licensed, from hospital dues, and from official fees, &c., or by the tonnage measurement act of May 6, 1864 [13 Stat. 69], or by any other legislation of congress in which the phrase vessel. or ships and vessels, may have been variously defined or applied.

The following are the principal sections of the act of congress of February 8, 1793 (1 Stat. 305), which have been cited with reference to the proceedings in this suit:

Section 1: "That ships or vessels, enrolled by virtue of 'An act for registering and clearing vessels, regulating the coasting trade. and for other purposes,' and those of twenty tons and upwards, which shall .be enrolled after the last day of May next, in pursuance of this act. and having a license in force, or if less than twenty tons. not being enrolled, shall have a license in force as is hereinafter required, and no others, shall be deemed ships or vessels of the United States, entitled to the privileges of ships or vessels employed in the coasting trade or fisheries."

Section 37: "That nothing in this act shall be construed to extend to any boat or lighter not being masted, or, if masted and not decked, employed in the harbor of any town or city."

Section 6: "That after the last day of May next, every ship or vessel of twenty tons or upwards (other than such as are registered) found trading between district and district, or between different places in the same district. or carrying on the fishery, without being enrolled and licensed. or if less than twenty tons. and not less than five tons, without a license. in manner as is provided by this act, such ship or vessel, if laden with goods, the growth or manufacture of the United States only, (distilled spirits excepted,) or in ballast, shall pay the same fees and tonnage in every port of the United States at which she may arrive, as ships or vessels not belonging to a citizen or citizens of the United States; and if she have on board any articles of foreign growth or manufacture, or distilled spirits, other than sea stores, the ship or vessel, together with her tackle, apparel and furniture, and the lading found on board, shall be forfeited. Provided, however, if such ship or vessel be at sea, at the expiration of the time for which the license was given, and the master of such ship or vessel shall swear or affirm that such was the case, and shall within forty-eight hours after his arrival deliver to

the collector of the district in which he shall first arrive, the license which shall have expired, the forfeiture aforesaid shall not be incurred, nor shall the ship or vessel be liable to pay the fees and tonnage aforesaid."

The boat libelled was not registered, or enrolled and licensed, or licensed. The purpose of the libel was to enforce the payment of the fees and tonnage dues which would have been payable if the boat were a foreign vessel. This boat was of a kind, which, in one of the opinions quoted below, was described as follows: "The boats in question are of peculiar character, not corresponding closely, or in any other than a most general way, with any other description of water-borne vessel. They are vessels in one sense, because they are things which can and do contain coal, and are moved upon the water; but for substantive and independent use, they do not come within the popular notion of a ship or vessel, any more than any other water-tight box would do. They are a mere capacity of holding and floating, and being pulled by an external power, and nothing more. When the boat is passing through a lock, it is a box about 42 feet long, 10 feet wide, and 4½ to 5 feet deep: A running board of about one foot wide extends along each side and across one end, to form a passage-way for the hands. At the other end there is a platform planked over for about eight feet in extent, to furnish accommodation to persons employed aboard, and to strengthen the work. The coal within is exposed to view, there being no deck, nor hatches, constituting a temporary or occasional deck. When two or more sections of the same description have passed the lock and come into the canal or river, they are connected end to end by hinges, and are moved in this connection together. On a canal they are moved by one or more horses or mules on the towing path of the canal. In a river they are moved by a steam tug. A man and two boys, or a woman in the place of one of the boys, are the working hands, the horse or mule being ridden or driven by a boy, and the man and woman or the other boy remaining on board. When attached to the steam tug, the horses or mules are commonly taken on board the tug, and the operatives are without employment until the horse or mule begins the work of towing, in the canal. The vessel or boat, call it by what name is thought best, has no moving power within itself, nor can it be moved otherwise than in the mode thus described. On a canal, a horse or mule, or some other animal power, is indispensable, to give it the capacity to transport anything. On a river, a steam tug, or a vessel that has a moving power within itself, is as necessary to give the boat the capacity to transport anything, as the animal power is on the towing path of a canal. The boat has, from

its being water-tight, capacity to contain coal or anything else on the water without sinking; but of itself, or by virtue of any machinery, whether mast and sail, or anything else, it has no capacity whatever to carry or transport anything; and when it is on a river or open water, it must be attached to a vessel that has a mast and sail, or machinery for motion, and it is only as an appurtenance to such a vessel for the time being, that it has any practical use in transportation."

Such boats, having first come into use long after the commencement of the present century, a question which arose in 1845, and has never been decided, was, whether they were vessels within the meaning and application of the act of 1793. In May, 1845, the president of the Lehigh Coal & Navigation Company, and certain officers of other canal companies, addressed letters to the Honorable Robert J. Walker, then secretary of the treasury, saying that their business was threatened with serious interruption from the proposed application to their scow-boats employed in the transportation of coal of the provisions of the act of 1793. They contended that the act did not apply to their boats, which could not with any propriety be considered as "ships or vessels" within the meaning of the act; which are navigated by persons without the slightest pretensions to the character of "seamen;" which are not engaged in the "coasting trade;" which are incapable of being employed without immediate detection in any attempt to evade the revenue laws; which have no masts, and were not in existence or use at the time of the passage of the act.

Accompanying these communications were the following opinions of counsel. The first of them, after giving the description of the boats as above, proceeded:

"If the question, whether such a boat is within the act of 18th of February, 1793, were to be decided by the fact of there having, or not having, been a particular intention to include it, there could be no doubt that it is not within the act, because there could have been no particular intention to include a description of vessel, which, at the date of the law had no existence. Neither canals, nor canal boats, were at that time, or for many years afterwards, known in the country. The boats and the mode of pulling them in an open river or bay, are altogether of subsequent invention or adoption. But this consideration is by no means decisive of their not being embraced by the enrolment act of 1793. No new variety of structure of boat or vessel can be deemed exempt from the operation of the law, if the general intent and provisions of the law embrace it, merely upon the ground that there was no particular intention to comprehend it. If such boats are within the general scope of the enrolment and license act, they will be comprehended by it, notwithstanding they are of recent invention and use. The

general scope of the act is first to be ascertained. If that is so broad as to comprehend every species of vessel that is water borne, and is capable of holding cargo, and of being moved by the power of another boat, then there is no ground for exempting from its operation the boats or vessels above described, since they are water borne, and are capable of containing cargo, and are so moved. But if the scope of the act is narrower than this, and only comprehends ships or vessels of certain characteristics, then the inquiry will be, whether these canal boats have the requisite characteristics.

"The first head of inquiry then is, whether such boats are entitled to be enrolled and licensed under that act, and to enjoy the privileges of ships and vessels employed in the coasting trade and fisheries. The act of 1793 does not expressly require that ships and vessels to be included within it, shall have a particular character, and that if they have not, they shall be excluded. It requires affirmative qualifications, and if any kind of water borne vessel is excluded, it is by implication, and not by express terms. Its first provision in its first section is, that ships and vessels enrolled and licensed, or if less than twenty tons, having a license in force, and no others, shall be deemed ships or vessels of the United States, entitled to the privileges of ships or vessels employed in the coasting trade or fisheries. There is nothing in any subsequent part of the act, which repeals or impairs the force of this enactment in regard to any description of vessel whatever. If a vessel is not enrolled and licensed, or if of less than twenty tons, is not licensed, she is not a ship or vessel entitled to the privileges of ships or vessels employed in the coasting trade or fisheries. What the consequences are which arise from her not having those privileges, must be ascertained from other parts of the act; but it is clear that enrolment and license are indispensable to confer those privileges. No ship or vessel indeed is, by force of anything in the act, compelled to take out an enrolment and license. She is free to go without it, or without any papers at all, if she does not claim to exercise the privileges of an enrolled and licensed vessel. But if she is found doing certain things mentioned in the 6th section, without an enrolment and license, then she is acting in violation of the law, and the penalty prescribed by the law attaches, if she and her acts and doings come within the description in that section.

"Although there is no express exclusion by the act of any vessel from the benefit of enrolment, it is nevertheless true that the second section of the act does prescribe certain qualifications and requisites, without which a ship or vessel cannot be enrolled or licensed. That section is explicit in requiring that for the enrolment of any ship or vessel, she shall have the same qualifications, and the same requisites in all respects shall be complied with, which are made necessary by the act entitled, 'An act concerning the registering and recording ships or vessels, passed the 31st December, 1793'; and without enumerating all of them, there are some which may be referred to as being necessarily confined to vessels of a certain description, and not applicable to such a kind of boat as is used for the transportation of coal upon canals, and is hereinbefore described. The carpenter's certificate may first be referred to as setting out what the law regards as the general or rather universal description of every ship or vessel that is entitled to enrolment and license. It must set forth besides other particulars, the number of her decks and masts, her length, breadth, depth and tonnage. There are others, but these are the only qualifications stated in the carpenter's certificate, which it is necessary to refer to. They may be regarded as descriptive merely, or required only for the purpose of identification; and doubtless they are so in part; but as regards one of these qualifications, that of a deck, not only does it necessarily enter into the character of a sea-boat, without which it is wholly out of the question to speak of her as a coaster or as engaged in the sea-fisheries, but it is also a fundamental part of an enrolled ship or vessel, without which the act of congress cannot be executed in regard to her.

"The rule prescribed for ascertaining her tonnage, necessarily implies that she has at least one deck; for an element in the admeasurement of the tonnage, is the depth of the vessel from the under side of the deck plank to the ceiling in the hold; and if she has no deck, she has no certain tonnage within the law, either to be inserted in the enrolment or to be the basis on which her duties are to be estimated under the law. It is quite possible that an arbitrary line may be taken from where the under side of the deck plank would probably be if the boat had one; but that is not within the enactment of the law, nor will it give the tonnage which is the lawful tonnage by which duties are estimated. The lawful tonnage is the tonnage under deck, and if the vessel has no deck, she has no such tonnage. Her tonnage may be what she will carry without sinking the boat, or falling overboard; but that is not the tonnage contemplated by the act of congress. In fine, the law does not recognise an enrolled vessel without a deck; and there is no matter of surprise in this, seeing that it would be preposterous to suppose that the owner of a vessel without a deck, would ask for the privileges of the coasting trade, fisheries, &c., which she could not enjoy. Such a vessel wants qualifications that are indispensable to a registry, and they are equally so to enrolment and license.

"The certificate of enrolment, a form of which is given, descriptive in general terms of all vessels that are within the law, and which is accompanied in the act by directions for filling the blanks in the printed form with

words descriptive of every vessel that can be properly enrolled, in like manner implies, if it does not more than imply, that the vessel is a decked vessel. It purports that the surveyor has certified that she has at least one deck, for it directs the number of decks to be inserted in a particular blank, and sets forth that the owner or person acting in his behalf has agreed to the description. It is possible that in practice a carpenter may certify that the vessel has no deck, and the custom house may fill the blank in the certificate of enrolment accordingly. But if they do, they deviate from the act of congress, and reject what the act expressly requires, giving the privilege of enrolment to a vessel that congress has made no provision for, but the contrary. When a deck is wanting, and her tonnage measurement is certified, it is impossible that it should be any thing more than conjectural tonnage. It cannot be ascertained according to the rule prescribed by congress, which is the only rule, and is the effective rule by which, and by which only, her tonnage duty is ascertained.

"Not only the objects of the enrolment law, but its language in many parts do so describe the ships and vessels comprehended by the act, as to show that open boats without the power of navigation in themselves, are not within its provisions, and have not the qualifications necessary for enrolment. When forfeiture is inflicted for trading without a license, or using a forged or altered license, or the license of another vessel, it is inflicted on the ship or vessel with her tackle, apparel and furniture. Forfeiture is never inflicted without this description of accompaniments of a ship or vessel, in the commercial sense, being annexed; and it is known that in the law of insurance, these words comprehend and cover the sails, yards, rigging, cables and the like, the accompaniment of not only a decked, but a masted vessel. Such is the general commercial import of the words. The words 'ship or vessel,' of themselves, imply, in the ordinary acceptation of merchants and mariners, a vessel competent for the sea. And in an act concerning the coasting trade and the fisheries, this must emphatically be their signification. It is wholly inadmissible to extend them to a scow, or to a boat, without a deck, that would be swamped by the ordinary waves of the sea. Such things do not rise to the dignity even of a barge or row boat.

"After a careful examination of all parts of the act, I entertain the opinion that such a boat as is described in the first part of this opinion is not entitled to enrolment. She wants the requisite qualifications. She cannot be measured according to law. Her tonnage, which means tonnage under deck, cannot be ascertained, for she has no deck. She can carry whatever can be put into her without sinking her; but though she has a tonnage capacity, she has no tonnage measurement. She has no mast and no deck, no power to avail herself of the privileges granted, and it would be preposterous to claim the privileges for her, because, without the aid of another vessel that is also enrolled, she could not exercise any of them.

"The thirty-seventh section of the act of February 18, 1793, may be thought to militate against this view. That section enacts that nothing in the act shall be construed to extend to any boat or lighter not being masted, or, if masted and not decked, employed in the harbor of a town or city. It exempts from the operation of every part of the law, a decked boat without masts, and a masted boat without decks, however employed in the harbor of a town or city. From which it may be inferred that a boat without masts or deck is within the law, and may be enrolled. But I regard this as a misapprehension of the design of that section. Within the harbor of a town or city, such as New York for instance, and Philadelphia, boats and lighters are necessary for the transportation of merchandise, foreign as well as domestic, from place to place, within the same district, and possibly from one district to another. In a large sense, such boats may be regarded as performing an act of trading, as often as they are so employed, and as going from place to place in the same district when they go from New York to Brooklyn or Staten Island, or from Southwark to Kensington. To prohibit their use in this way, would be to deprive the trade of a city of an essential accommodation; and it would be prohibition if they were exposed either to forfeiture or to foreign duties, if found so trading without enrolment and license. The section means therefore, to exempt boats so employed with masts only, or with decks only, from the operation of the act altogether. It does not imply, that such boats, and still less that boats without either masts or decks are entitled to certificates of enrolment, but it exempts boats with one only of the qualifications, from the penalties of the law, if their employment be thus limited. It implies rather that boats without either masts or decks, are not within the act, by excepting boats that are only masted or decked, and not both, as not being within the operation of any part of the act.

"It being clear then, according to my opinion, that a canal boat such as I have described, is not within the act entitled to enrolment, as wanting the essential qualifications required by law, the next inquiry is, whether such a boat is made incapable by law of the use to which it is applied in the carrying of coal in the manner stated from district to district, or from place to place within the same district. And this, it will readily be seen, is a question of great importance; for if such boats have not the legal qualifications for enrolment and license, they cannot be enrolled and licensed; and if without enrolment and license they cannot be used in the manner described, the carrying of

coal from Bristol to Philadelphia, or to New York, through the Delaware and Raritan Canal, is almost necessarily destroyed, for it can hardly be carried in any other boats. If they cannot carry it, there must be transhipment into an enrolled vessel at Bristol, and if the enrolled vessel cannot pass through the Delaware and Raritan Canal, there must be another transhipment at Bordentown, and again at Brunswick. Canals for the transportation of coal may be regarded as almost superseded by the interpretation. The impediment to the use of these boats in the manner stated, if found anywhere in the act, is to be found in the sixth section, which enacts that every ship or vessel of twenty tons and upwards found trading between district and district, or between different places in the same district, without being enrolled or licensed, or if less than twenty and not less than five tons, without a license. if laden with goods the growth or manufacture of the United States, distilled spirits excepted, shall pay the same fees and tonnage in every port of the United States where she may arrive, as ships or vessels not belonging to citizens of the United States; and if she has on board foreign goods, &c., or distilled spirits, the ship or vessel, together with her tackle, apparel and furniture, and the lading found on board, shall be forfeited.

"The force and effect of the prohibition, lie in the words, 'every ship or vessel found trading,' &c. The penalty can attach only to such a boat as is a ship or vessel, within the meaning of the act, and is found trading in the manner restrained or prohibited by the act. Now I apprehend, in the first place, that such a canal boat as has been described, is not a ship or vessel in the sense of the act. She has hardly any more of the attributes of a ship or vessel, in either commercial or common language, than a raft of logs on the water. Boards might be placed upon such logs, and coal might be placed upon the boards—and the whole might be moved by the same power that moves such canal boats. The circumstance of the raft's containing or holding coal, and being moved upon the water, would not make it a ship or vessel in the sense of the act, though in a very general sense, it might be regarded as a vessel. The canal boat described, is a series or succession of connected boxes, which, whether separate or united at the hinges, is incapable of coasting, either on the sea or in a river, or of being moved by any power within itself. It has no independent or internal capacity whatever, except that of holding the coal. Its practical use, its practical existence indeed, is as an adjunct to something else. It cannot be conceived of as a practical instrument of any kind, except in connection with something external, that is to say, some external animal power, on the shore, or some external wind or steam power on the water. The act

cannot be understood by its general language to comprehend such a thing. The policy of the law in regard either to ships or seamen, cannot be understood to embrace such machines as these, or such persons as are employed to drive the horses or mules, or to attend to mere laborers' duty on board. No one interest of either shipping or seamen, can be considered as involved in them.

"But the material consideration remains; and that is a consideration which opens a view of the subject which shows both practically and legally that these boats are never in the predicament which brings on the penalty of the law. While they are within the canal, and are towed by a horse, it is understood that, whatever may have been the doubt at one time, it has long been the settled understanding, that the enrolment law takes no cognizance of them. It is only when they become an adjunct to a steam tug, that the lawfulness of their employment is questioned.

"It is obvious that the act of congress, in all its provisions, has reference to separate, unconnected, independent ships or vessels, moved or propelled by a power within themselves, and trading from district to district, or between different places by their own capacity. The ship or vessel is always spoken of in this character. She is represented as the acting, moving, trading, and transgressing body; and no one can doubt that this was the only acceptation in which the words 'ship or vessel found trading, from district to district,' could have been received at the passage of the act. A scow or boat drawn by another boat, and depending wholly upon it for motion and change of place, is not such a ship or vessel. For all purposes of trading, as well as for change of place, the acting, moving, trading, and transgressing body, is the vessel that moves, and the canal boats only as part of her. If the moving or propelling boat is moving, and trading in violation of law, the penalty is incurred; but if her moving and trading are lawful, the manner in which she transports cargo does not make her trading unlawful. If the steam tug herself is not qualified to carry on such trade from district to district, or between different places in the same district, the law is violated by her. But if she is so qualified, then no offence is committed, for in fact, as well as in law, it is the steam tug that is found trading, and not the boxes or boats that contain the coal. The law regards the ship or vessel as an offending agent—as a body that by her own capacity carries on the trade—and if she is a mere scow or floating box, attached to another vessel that pulls or moves her, her character is lost in that of the moving and acting vessel that carries her along.

"Put the case that a steam boat has a constant attachment to her sides, of two such boats carrying coal or other merchandize; can it be doubted that the steam tug

is the trader, and that her papers protect the trade? If unlawful trade is carried on with, or from, the boats, can it be doubted that the bond given upon the enrolment of the steam boat, to secure the United States against her being employed in an unlawful trade, is forfeited? And it is this that constitutes the security of the government against unlawful trading by such boats; that they are a part, or adjunct of the vessel that navigates them, and as much a part of her, as her own boats during the whole voyage from beginning to end—for they are connected with her from the moment they are attached to her, and are incapable of motion to or from different districts, or different places in the same district, without her. If the steam tug is not the vessel found trading, then she would not be so, if she placed merchandize in her own boat, and towed it at her own stern; and if such canal boats are to be regarded as found trading, then the boat of the steam tug, if laden, would be so regarded, and the bond of the steam boat would not be answerable for any unlawful trading with or from the boat. Such a view of the act cannot be defended. There is no law that compels a coaster to carry her cargo in her hold. She may carry it on her deck. She may stow it in her boats on deck. If necessary, or convenient, she may tow her boat with cargo in it. Whatever she tows and moves from district to district, or between different places in the same river, is her trading. If lawful to her, it is lawful to the goods she carries, and to the boats in which they are carried. If unlawful to her, her bond is forfeited.

"Again, unless some distinction is made in behalf of open boats, not decked, in carrying coal from district to district, when drawn by another boat, I know not how the most ordinary intercourse between different districts on the same river is to be carried on. From Bristol, in Pennsylvania, to Burlington, in New Jersey, coal must be transhipped at Bristol, into an enrolled coaster, and carried under deck to Burlington, on the opposite side of the river. I think it cannot be protected in the open boat, under the section which exempts from forfeiture boats employed in the harbor of a city or town. The coal boats are not so employed; and the harbor of Bristol is not the harbor of Burlington, nor vice versa. The evils of the contrary construction seem to be immense.

"After careful consideration of the case, under the acts of congress, I am of the opinion that the boats in question cannot be legally enrolled and licensed; and that, whether in a canal, pulled by horse or mule, or on tide water, or in an open river or bay, attached to a steam tug which draws them with their loading of coal, they are not in violation of law, nor is the law violated in any way, in their being drawn from district to district, or between different places in the same district, by a steam tug, if the steam tug herself is enrolled and licensed to carry on the coasting trade.

"Hor. Binney.

"Philada., May 13, 1845."

"A suggestion has been made by one of the managers of the company, which, as an illustration of part of the preceding opinion, appears to have great force. The penalty under the sixth section for trading with domestic produce, is the payment of the same fees and tonnage as ships or vessels not belonging to the United States. But the tonnage is matter of admeasurement depending on a deck. How then can the penalty be applied to an undecked boat? This also shows that congress did not mean to include such a boat within the prohibition.

"Hor. Binney.

"Philada., May 14, 1845."

"Philada., May 14, 1845. I fully concur in the foregoing opinion of Mr. Binney.

"J. K. Kane."

"I do not doubt that the floating coal chests or boxes used on the Lehigh and Delaware Canals, and particularly described in the opinion of Mr. Binney, would be embraced by the general phrase 'vessel' employed in the repealed act of congress of the 1st of September, 1789, and in the subsisting act of the 18th of February, 1793, relating to the coasting trade. Their rough and primitive character, and their being without masts, or decks, or keels, or rudders, could not withdraw them from the comprehensiveness of that term. Nor do I doubt that such vessels, although unprovided with a motive power within themselves, being without sails, or steam, or even oars or pushing poles, might, nevertheless, if dragged from one side of a river in one collection district, to the other side, and into a different collection district, by means of open wherries or batteaux, or by long ropes, as it is still common with ferry boats or scows, fall within the general scope of those acts of congress, if otherwise liable to do so. Yet, I am clear in the opinion, that by these laws, the enrolment and licensing are mere modes of receiving particular privileges and immunities to certain descriptions of American vessels—not to all American vessels—and that these floating coal chests or boxes do not, and really cannot, come up to the requirements on which only they could be entitled to enrolment and license, or be held subject to the fees and tonnage of foreign vessels. These requirements are fully adverted to by Mr. Binney, or I would repeat them.

"G. M. Dallas.

"May 17, 1845."

Before and after the date of these opinions, canal boats of other kinds, with motive power of their own,—sails, oars, or steam,—were also used for transporting coal and other cargoes through canals, and from thence,

through navigable waters, to market. In the Delaware and Raritan Canal, in 1843, four canal boats with sails, and four others propelled by steam, were thus in use. In the slack water and canal navigation of the Connecticut, small steamers had been previously, and were afterwards used; and on the state canals of New York, steamers have since been used. Some of the boats, large and small, drawn by horses through canals, have always been provided with oars for use after leaving the canals. The number of such boats with oars has been reduced since the commencement of the use of steam tugs.

An act of July 20, 1846 (9 Stat. 39), "to exempt canal boats from the payment of fees and hospital money," was in the words, "The owner or owners, master or captain, or other persons employed in navigating canal boats without masts or steam power, now by law required to be registered, licensed, or enrolled and licensed, shall not be required to pay any marine hospital tax or money; nor shall the persons employed to navigate such boats receive any benefit or advantage from the marine hospital fund; nor shall such owner or owners, master or captain, or other persons, be required to pay fees or make any compensation for such register, license, or enrolment and license; nor shall any such boat be subject to be libelled in any court of the United States for the wages of any person or persons, who may be employed on board thereof, or in navigating the same." And all acts, &c., repugnant to this act, were thereby repealed.

"An act to regulate the admeasurement of tonnage of ships and vessels of the United States," was passed on May 6, 1864 (13 Stat. 69). In section 3 of this act, the phrase "open vessel," is used to designate a vessel without a deck. The section prescribes the manner of ascertaining by admeasurement, the register tonnage of vessels with a deck or decks, and also provides for ascertaining the tonnage of open vessels by admeasurement. Section 4 limits the charge for the measurement and certifying of tonnage, so that it shall not exceed one dollar and fifty cents for each transverse section under the tonnage deck, and three dollars for measuring each between decks above the tonnage deck, and one dollar and fifty cents for each poop, or closed in space, available for cargo or stores, or for the berthing or accommodation of passengers, or officers and crew, above the upper or spar deck. The act contains no express provision for any charge or compensation whatever, as to open vessels. Section 5 is in the words: "The provisions of this act shall not be deemed to apply to any vessel not required by law to be registered, or enrolled or licensed, and all acts, or parts of acts, inconsistent with the provisions of this act, are hereby repealed."

The concluding clause of the act of March 3, 1851, limiting the liability of ship owners (9 Stat. 635, 636), provides, that the act shall not apply to the owner of any canal boat, barge, or lighter, or to any vessel of any description whatsoever, used in rivers or inland navigation. The revenue act of July, 1862, § 15 (12 Stat. 558), imposed an additional tonnage duty on all ships, vessels, or steamers, entered at any custom house in the United States, from any foreign port or place, or from any port or place in the United States, or belonging wholly, or in part, to subjects of foreign powers, provided, that the tax or duty should not be collected more than once in each year on any ship, vessel, or steamer, having a license to trade between different districts of the United States. The internal revenue act of June 30, 1864, § 103 (13 Stat. 275), imposed a duty of 2½ per cent upon the gross receipts of every railroad, canal, steamboat, ship, barge, canal boat, or other vessel, or any stage coach, or other vehicle engaged or employed in transporting passengers, or property for hire. The amendatory act of March 3, 1865, § 4 (Id. 493), increased the tonnage duty still further; and exempted the receipts of vessels paying tonnage duty from the tax of 2½ per cent. The ninth section of the internal revenue act of 13th of July, 1866 (14 Stat. 136), amended the 103d section of the act of 1864, by striking out all after the enacting clause, and substituting enactments imposing a tax of 2½ per cent on the gross receipts from passengers and mail carried by railroad, canal, steamboat, ship, barge, canal boat, or other vessel or stage, coach or other vehicle, with incidental regulations, and with certain exceptions and qualifications. It was further provided, that all boats, barges, and flats, not used for carrying passengers, nor propelled by steam or sails, which are floated or towed by tug boats or horses, and used exclusively for carrying coal, oil, minerals, or agricultural products to market, should be required hereafter, in lieu of enrolment fees or tonnage tax, to pay an annual special tax of five dollars, for each boat of a capacity exceeding twenty-five, and not exceeding one hundred tons, and ten dollars for each boat of greater capacity. This proviso is repealed by the act of July 14, 1870. Section 33 of an amendatory act of March 3, 1867 (14 Stat. 484, 485), was in the words: "The tonnage duty now imposed on all ships, vessels, or steamers, engaged in foreign or domestic commerce, shall be levied but once within one year; and, when paid by such ship, vessel, or steamer, no further tonnage tax shall be collected within one year from the date of such payment."

An act further to prevent smuggling, &c., passed July 18, 1866 (14 Stat. 178), § 1, enacts that, for the purposes of the act, the term vessel, whenever therein used, shall be held to include every description of water-craft, raft, vehicle, and contrivance, used, or capable of being used, as a means or auxiliary of transportation, on or by water; and the term vehicle, to include every description of car-

riage, wagon, engine, car, sleigh, sled, sledge, hurdle, cart, and other artificial contrivance used, or capable of being used, as a means or auxiliary of transportation on land. Section 28 enacted, that all vessels, which, under the provisions of the above mentioned fifteenth section of the act of July 14, 1862, and fourth section of the amendatory act, of March 3, 1865, were exempted from paying tonnage duties more than once in a year, should pay the same at their first clearance in each calendar year; provided, that all licensed, and enrolled and licensed vessels, should pay the duty when taking out their respective enrolments or licenses, if the same had not been previously paid; and provided further, that nothing in the act should be construed to prevent customs officers from collecting such tonnage duty at the entry of any vessel during the year, if not previously paid; and provided further, that all vessels, which were subject to enrolment or license, should thereafter, be liable to the payment of the fees established by law, for services of customs officers incident thereto.

The twenty-fifth section of the act of July 14, 1870, to reduce internal taxes, &c. (16 Stat. 269), so amended section 15 of the act of July 14, 1862, and section 4 of the amendatory act of March 3, 1865, that no ship, vessel, steamer, barge, or flat, belonging to any citizen of the United States, trading from one port or point within the United States, to another port or point in the United States, or employed in the bank, whale, or other fisheries, should thereafter, be subject to the tonnage tax or duty provided for in those acts; "and the proviso in section 103" of the act of June 30, 1864, "requiring an annual special tax to be paid by boats, barges, and flats," was repealed. The intended subject of this repeal, was obviously the proviso contained in that part of the ninth section of the act of July 13, 1866, which had been thereby substituted for the 103d section of the act of June 30, 1864. The effect of the act of 1870, was to exclude wholly the application of previous and existing internal revenue laws to the boats in question.

The district attorney, Mr. A. H. Smith, and the assistant district attorney, Mr. Valentine, contended that the act of 1846, and the tonnage register act of 1864, were in effect legislative declarations that the act of 1793 was applicable to such boats, that the enactment in the revenue law of 1866, imposing a special tax, in lieu of enrolment fees or tonnage tax, was a legislative declaration, that such boats had been liable to such fees and tonnage tax, and that the repeal of the latter act in 1870, revived this two-fold liability. They contended, therefore, that if there had otherwise been doubt of the applicability of the act of 1793, the doubt was removed by the subsequent legislation.

Mr. Gibbons, for the claimant [Boyle], denied the applicability of the act of 1793, to such boats. He relied upon reasons and arguments contained in the above opinions of counsel. He also contended that the act could not be understood as applicable to vessels of a kind unknown when it was passed; that the transportation of coal in these boats, was not a trading within the meaning of the act; that the act of 1846, left open to future decision the question of the effect of the former act, exempting the boats from fees and charges, whether otherwise liable to them or not; that the tonnage act of 1864 did not annul the exemption, or create any new liability of such boats.

CADWALADER, District Judge. The word "trading" may have meanings which vary with its different applications. In laws concerning navigation, every vessel carrying a cargo or passengers may in general be considered as trading. Boats of the kind in question, though, in the language of the repealed proviso of the internal revenue act of 1866, "used exclusively for carrying coal, oil, minerals or agricultural products to market," would be considered as trading, within the meaning of the act of 1793, if it were otherwise applicable. See [Gibbons v. Ogden] 9 Wheat. [22 U. S.] 215–219. I think that the act of 1793, if the thirty-seventh section had been omitted, would have been applicable to everything afloat, navigable by motive power of its own, and transporting a cargo, whether the motive power were that of oars, that of sails, or that of steam, whether the vessel were of a kind which was known at the date of the act or not, and whether she had a deck or was open. If a more limited meaning were attributed to the phrase ship or vessel, purposes of the act might be frustrated. The thirty-seventh section shows, that an express exception was considered necessary, in order to prevent the act from being applicable to boats of more than five tons, moved only by oars. If the section had been omitted, there would be no more reason to exclude steamers from the application of the act of 1793, than to exclude vessels propelled, in the primitive manner, by oars, of whose use the frequency has been diminished by the innovation of steam tugs. See [Gibbons v. Ogden] 9 Wheat. [22 U. S.] 219, 220.

Here, two alternative, and very different interpretations of the thirty-seventh section, must be considered. The section, according to one interpretation, excludes from the operation of every part of the act, all boats or lighters whatsoever, which are not masted; and, of boats and lighters which are masted and not decked, excludes only such as are employed in the harbor of any town or city. According to the other interpretation, the qualification of being employed in the harbor of a town or city, extends to all the subjects of the section; so that the exception from the operation of the act includes no boat or lighter not masted, unless it is employed in such a harbor. According to the former interpretation, the boats in question, as they

have no mast, could not be subjects of the act of 1793, for any purpose. According to the latter interpretation, the question of the applicability of the act, cannot thus be summarily disposed of. In deciding between the two interpretations of the thirty-seventh section, it must be remembered, that punctuation of a statute forms no part of it, and is not recognizable as controlling its interpretation. 4 Durn. & E. [4 Term R.] 65, 66; L. R. 3 C. P. 519, 521, 522; 9 Gray, 385. And see [Ewing v. Burnet] 11 Pet. [36 U. S.] 54. But it is necessary to find, if possible, a meaning and purpose for every word of the section.

If the first of the interpretations be adopted, every word will have its fair and full effect. "Nothing in the act" will then "be construed to extend to any boat or lighter not being masted—or, if masted, and not decked, employed in the harbor of any town or city." But, according to the second interpretation, the word "and" has no effect, which is not repugnant or embarrassing. Therefore, if the question were new, I would have no difficulty in deciding that the thirty-seventh section of the act of 1793, excluded the boats in question from the application of the act of 1793, if it would otherwise have been applicable to them. But the second interpretation of the section, appears to have been so generally adopted, though I do not see for what sufficient reason, that I am constrained to doubt the correctness of my opinion upon the point. Therefore, as I am also of opinion that, although the second interpretation were the correct one, the conclusion would nevertheless be the same, I will, in what follows, consider the question of the applicability of the act of 1793 to these boats upon the assumption, which seems to have been so general, that the thirty-seventh section does not apply to them, but applies to such boats only as are employed in the harbor of a town or city. I think the act inapplicable to the boats in question, because they are without oars, or masts, or steam, or motive power of any kind which can be called their own. For this reason, they are not included in the ordinary general description, of ships or vessels, which is the only designation contained in the act.

A vessel of private ownership represents an organization which is part of the social system of the country to which she belongs. In this representative character, she has legal attributes, and legal rights, and may incur legal responsibilities, however and by whomsoever she may be navigated. [The China v. Walsh] 7 Wall. [74 U. S.] 53. And see [The James Gray v. The John Fraser] 21 How. [62 U. S.] 191, 192. The sole purpose of this organization is her navigation, and its incidents. That which cannot be made navigable through any internal command of a propelling force, cannot. in a strict sense, be, nautically speaking, a vessel, though she may be called such for the convenience of identifying her with what was once navigable, and may, in some cases, become so again. This remark

applies variously under different circumstances. It may apply to a vessel when she is laid up in a port, at home or abroad, or when she is an absolute wreck, whether stranded or afloat; and may have a qualified applicability to a vessel's own boat when it is towed astern. The case of a sailing vessel which is lashed to the side of a steam-tug, is also temporarily an example. The supreme court have said, that "whenever the tug, under the charge of her own master and crew, and in the usual and ordinary course of such an employment, undertakes to transport another vessel which, for the time being, has neither her master nor crew on board, from one point to another, over waters where such accessory motive power is necessarily. or usually employed, she must be held responsible for the proper navigation of both vessels; and third persons suffering damage, through the fault of those in charge of the vessels, must, under such circumstances, look to the tug, her master or owners, for any injuries that vessels or cargo may receive by such means." [Sturgis v. Boyer] 24 How. [65 U. S.] 122. When the towage is by a hawser, the vessel towed is not liable except so far only as her movements are at her own command, and she is in fault, or negligent in respect of them. [The James Gray v. The John Fraser] 21 How. [62 U. S.] 193, 194.

The reason is much stronger, and its application more simple. in the case of the boats in question. They are absolutely, at all times, without motive power at their command. Though ordinarily called boats, they have been also more properly designated as floating trunks or boxes. They are not subject to admiralty and maritime jurisdiction. Judge Nelson was inclined to this opinion. He thought that they were not ships or vessels, when upon public navigable waters, because they had no power as respects navigation upon such waters. The Ann Arbor [Case No. 408], A. D. 1858. The intimation was extrajudicial, the decision upon the merits being against the libellant. There had, however, been a previous decision of Judge Grier against the admiralty jurisdiction. He said that such boats were not ships or vessels in the maritime sense of the term; and added, that they do not take out a coasting license. Jones v. The Coal Barges [Id. 7,458], A. D. 1855. This dictum is in point upon the present question. But it will be necessary to consider the question upon original grounds, because the case before Judge Grier was that of one of the canal boats on the Monongahela, which are described in the report somewhat differently from the description of the boats in question here; and also because laws concerning navigation may apply incidentally to what are not subjects of admiralty and maritime jurisdiction.

Certainly, however, such a boat as is here in question is not a vessel in any sense in which the word is ordinarily used in laws concerning navigation. In the act of 1851, limiting the

liability of ship owners, the general phrase, "ship or vessel," must be understood as applicable only to a vessel responsibly navigated. Therefore, if the concluding provision, that the act shall not apply to the owner of any canal boat, barge or lighter, or to any vessel of any description whatsoever, used in rivers or inland navigation, had been omitted, the former general phrase, if applicable to canal boats, would not have included any others than such as have sails, oars, or steam power of their own. To make the word vessel, or boat, in an act of legislation of any kind, applicable to the boats in question, superadded words of special description have been considered necessary. Thus, in the repealed proviso of the internal revenue act of 1866, they were described as boats not propelled by steam or sail, which are floated or towed by tug-boats or horses. In the first section of the act of the same year against smuggling, it was thought necessary to provide expressly that for the purposes of that act the term vessel should be held to include every description of watercraft, raft, vehicle and contrivance used, or capable of being used, as a means or auxiliary of transportation, on or by water. This amplified form of description would not have been adopted, if the word "vessel," unexplained, had been deemed of co-extensive import. If the description, thus amplified, includes the boats in question for the purposes of that act, they are so included by force of the phrase "means or auxiliary of transportation on or by water."

Vessels to which the act of 1793 applies, and which, on compliance with its requirements, are entitled to the privileges and exemptions conferred by it, must be owned and commanded by citizens of the United States. Before any boats like those in question were known, an act of congress of March 12, 1812 (2 Stat. 694), allowed steamboats employed only in rivers or bays of the United States, owned wholly or in part, by resident aliens, to be enrolled and licensed as if they belonged to citizens of the United States, according to, and subject to, all the conditions, limitations and provisions contained in the act of 1793. The tugs which tow the boats in question may thus be owned by resident foreigners. The enactment of 1812 was not mentioned in the argument of this case. But my attention was drawn to the act by an observation of counsel, that a great many of the boats in question are owned, or in the charge of resident aliens. If such a fact has been wholly disregarded for the greater part of half a century, the most rational explanation is, that the exemption of the steam tug, which alone has the motive power, has been regarded as including that of the tow which has no independent navigability. The suggestion that the character and amount of the fees and charges for transporting coal, or any thing else, from the interior of the country to a domestic market by towage, may vary as the Irishman, German or Englishman owning the tow or having charge of it, has, or has not, become a naturalized citizen, seems absurd.

If the foregoing views are correct, the words of the act of 1793 do not apply to canal boats having no motive power of their own, but, according to the second interpretation of the thirty-seventh section, apply to canal boats of a certain tonnage, which, though without masts or steam-power, have oars. That the latter boats, when in rivers and bays, have the command of their own movements, with consequent responsibilities, might be a sufficient reason, that they should be requirable to be licensed, or enrolled and licensed. But that they should incur the incidental burdens of coastwise maritime navigation was nevertheless very incongruous to the nature of inland navigation. This may explain the purpose, or one of the purposes, of the act of July 20, 1846. It may have been a reconciling purpose to remove this incongruity, and yet fulfil the exigency of the act of 1793, by relieving canal boats with oars of all maritime burdens without dispensing with the requirement of a license or enrolment and license. Another purpose of the act of 1846 may have been to meet provisionally in like manner, any future decision of the case of canal boats like those now in question, which had then been a disputed case. If this two-fold purpose existed it would have been attained by defining in the act, the subjects of it as "canal boats without masts or steam-power," and exempting them from the peculiarly maritime burdens of hospital dues, fees and charges of registering, enrolling or licensing, and subjection to libels for wages. The boats thus exempted, whether provided with oars or not, were according to this interpretation, such boats only as were then, "by law, required to be registered, licensed, or enrolled and licensed."

The opinions of counsel which have been mentioned in the course of the argument, and the accompanying letters from the officers of canal companies, were filed in 1845, in the treasury department, where they now remain. There can be little doubt, if any, that these papers were before the eyes of the framer of the act of 1846. It is, therefore, extremely probable that he had in view the two-fold purpose which has been suggested. But, unless the words of the act sustain the consequently suggested interpretation, it cannot be adopted. The intention of a law maker is to be legally deduced, not from what may thus have been his probable purpose, but from the meaning of the words which he has used. Here I doubt greatly whether the meaning of the words authorize the suggested interpretation of the act of 1846. In the contexts of this act, wherever the phrase canal boats without masts or steam power occurs, it is never used otherwise than in connection with persons employed to navigate them. It is true that the former expression is once used with a disjunctive relation to the owners. But it is also twice used without any possi-

bility of such an alternative relation. The words, "nor shall the persons employed to navigate such boats receive any benefit or advantage from the marine hospital fund," and the provision against libelling any such boat for the wages of any person or persons employed on board or in navigating her, are thus applicable to such canal boats only as have oars. Therefore, I incline to the opinion that the application of the words of the act is limited to such as have oars. The provision against libeling for wages would otherwise be insensible, as well as the provisions concerning persons navigating the boats. The only doubt is, whether the act applied likewise to the boats in question. This doubt is, to say the least, very great.

The point is quite immaterial, if I am right in thinking as I do, that there is no intention apparent in the act of 1846, to determine to what boats the act of 1793, applied. It was, however, in the argument, assumed that the act of 1846 indicates a belief on the part of congress, that all canal boats without masts or steam power, including the boats in question, were, by law, required to be registered or licensed, or enrolled and licensed; in other words, a belief that the act of 1793 applied to all such boats. Though I think the assumption erroneous, it will not be amiss to consider whether, if the words of the act of 1846 imported such a legislative belief, they would affect the decision. If such were the meaning of the words they would, as we have seen, misconstrue the act of 1793. Words of legislation importing an erroneous construction of a pre-existing statute have not the effect of a law establishing the construction as valid for the future, unless they also import a declaratory or other enactment. This rule, however well established, is very seldom applied, because there is no invariable form of a declaratory statute, and the legislature may at present enact how a prior one shall be construed in future. We have also constant experience that successive statutes on the same subject may be read in connection with one another and harmonized, as if they together constituted one and the same law. These explanations and qualifications of the rule do not abrogate it. My predecessor, Judge Hopkinson, stated the rule too broadly perhaps, when he denied that a legislature had a right to impose upon a court their construction of their statutes previously passed. He said that it was for the court to construe the law; but added that it was the right and duty of a judge to look into all the statutes made upon the same subject to discover what was the intention of any of their provisions, thus to ascertain the true meaning and construction by his own judgment, and not by any subsequent legislative declaration of intention or construction. 8 Pet. [33 U. S.] Append. 734. The rule, and a proper qualification of it, were stated with precision by Chief Justice Marshall. He said that a mis-

taken opinion of the legislature concerning the law, does not make the law, but that if the mistake is manifested in words competent to make the law in future, there is no principle which can deny them this effect, and that a law, not in form declaratory, though inoperative on the past, may act in future, by expressing the sense of the legislature on the existing law as plainly as a declaratory act. [Postmaster-General v. Early] 12 Wheat. [25 U. S.] 148, 149. In an English case, Le Blanc, J., said, that a court if clear in their construction of a statute, would be bound to give it effect, though they should be of opinion that an erroneous construction had been put upon it by subsequent statutes. 16 East, 326. In that case, the framers of a statute had, in reciting a prior statute, misconstrued it. Lord Ellenborough said that he might be under a compulsion, through subsequent statutes, to put a perverse and unnatural interpretation on the original statute, but that he would endeavor as far as he could, without violating the fair rules of construction, to maintain the integrity of the original text, unvitiated by subsequent construction, if he might so say. Id. 319, 320. After stating and explaining the misconstruction, which consisted in misreciting the effect of the original statute, he asked whether the framers of the misconstruing statute had imposed upon the court, by any enactment, the necessity of adopting that which he must assume to be their error if the words of the prior act were intelligible in themselves. In his opinion the recital in the subsequent act could not overrule the plain intelligible sense of the prior one. Id. 324, 325. Where a perpetual statute, English or colonial, was, through legislative inadvertence, continued in force by the words of a subsequent statute, until the end of the legislative session, or for two years, the perpetual statute was not abrogated, but continued in force after either period limited. Hobart, 215; T. Raym. 397. An act of the legislature of Pennsylvania subjected all real estate within one of the corporate municipalities of a county to a lien for assessments, to which all real estate in the county had, by a former act, been made subject The supreme court of the state said that the passing of the subsequent act, at most, only proved that the legislature were not then aware that the assessments had been made liens by the previous act; and added that it could not be sustained for a moment, that the legislature's mistake or misapprehension of the law in this respect would make it different from what it really was. 5 Rawle, 317. A series of English statutes prohibiting and restricting commerce, &c., with enemies were forensically reviewed in 1794. 6 Durn. & E. [6 Term R.] 38–44, 47–50. Many of these enactments indicated that the parliament received the prohibitions necessary in order to make such trading and intercourse illegal.

Most of the legislative provisions on the subject were otherwise unnecessary. But they were wholly disregarded in this respect by decisions of the king's bench, (6 Durn. & E. [6 Term R.] 23, 35; 8 Durn. & E. [8 Term R.] 548, 561), and had previously been so disregarded by the court of admiralty (1 C. Rob. Adm. 196, 220).

If the law of 1846 had contained words of equivalent effect with a recital that the boats in question were included in the law of 1793, the only enactment in the law of 1846 would be the concession of an exemption from certain supposed liabilities. Such a legislative concession would not constitute an enactment including the boats in that description, or otherwise enlarging the effect of the act of 1793. The authorities which have been cited therefore, show that the decision of this case cannot be affected by the act of 1846. It is not necessary to consider the tonnage measurement act of 1864, because the fifth section excludes the application of the act to any vessel not required by the law to be registered, or enrolled or licensed.

As to every question in this case, the act of 1870 has excluded wholly the application of the internal revenue laws of 1862, 1864, 1865, and 1866. If they had continued in force, the only question which would have required attention, has, in principle, been disposed of in considering the act of 1846. This question would have arisen upon the words "in lieu of enrolment fees or tonnage tax," in the proviso contained in that part of the ninth section of the revenue act of 1866, which was thereby substituted for the 103d section of the revenue act of 1864. If these words indicated a legislative belief that the boats in question were subject to the payment of enrolment fees or tonnage tax, they were words not of enactment, but recital, and misrecited the existing law. But the repeal of the proviso deprives the question of any importance which might otherwise have been attributable to it. The only act of congress, which has not been sufficiently considered, is a provision of the twenty-eighth section of the act of 1866, against smuggling. The provision is, that all vessels, which were subject to enrolment or license, should thereafter be liable to the payment of the fees for services of customs officers, incident thereto. This provision, considered as an isolated enactment, would be of no significance in the case. If, as to those canal boats which are included in the description of vessels, in the act of 1793, the provision repealed the exemption from certain maritime charges, of which such canal boats had been relieved by the act of 1846, the process of legislation to deprive them of the exemption, was indirect, and the exposition of the purpose to do so was obscure. But, if such was the legislative intention, it could not extend beyond the subjects of the former exemption; and, if I

have rightly interpreted the act of 1846, which conceded the exemption, the act applied only to such canal boats, without masts or steam power, as have oars.

The point of inquiry is, however, different. The question is upon the effect of the 1st section of the act against smuggling on this provision of the twenty-eighth section. The first section, which has already been quoted, extends, for the purposes of the act, the meaning of the word vessel, so as to make it, for such purposes, include every description of watercraft and means or auxiliary of transportation on or by water. The title of the act is "An act further to prevent smuggling and for other purposes." The provision of the twenty-eighth section applies to all vessels subject to enrolment or license; and the argument for the United States, if I rightly understand it, is, that the provision must be read as if its words were: "All vessels, including every description of watercraft and contrivance used or capable of being used as a means or auxiliary of transportation on or by water, which are subject to the enrolment or license, shall hereafter be liable to the payment of the fees established by law for services of customs officers incident thereto." If this were the actual phraseology of the twenty-eighth section, it would have no effect beyond subjecting to payment of the fees, all such watercraft, &c., as were already subject to enrolment or license. Whether it would be wise or unwise to abrogate thus far the exemption conceded in 1846, the purpose to do so would be intelligible. But the phrase, "purposes of this act," in the act of 1866, would be extravagantly extended beyond its fair import, if made to enlarge inferentially the purposes of other statutes whose provisions may be supposed incidentally in question.

To effectuate the legitimate purposes of the act against smuggling, boats, trunks or boxes, like those in question, may in certain cases, be forfeitable, as appendages of the tug which tows them, for her violations of penal enactments. Whether, in other cases, they may, when themselves peccant receptacles of smuggled property, or when otherwise used unlawfully, be forfeitable independently of such tug, is an inquiry foreign to the question whether they are, when towed by her, subject to distinct enrolment or licensing under the act of 1793. The purpose of the first section of the act of 1866, was merely to prevent its own provisions in subsequent sections, from being liable to evasion through any mis-description, or doubtful description of watercraft. It was no purpose of the act to duplicate requirements of the act of 1793, by requiring enrolment or license of the tows which are without motive power, and of whose tug a license was already required. As these tows, though innavigable, float when detached from their tug, legislation requiring

them to be named, and enrolled, or licensed, might be useful to prevent smuggling, or facilitate its detection. But the inference of such a motive of legislation, from words of enactment imposing charges which are properly incidental to such navigation only, as whether coast-wise or foreign, is peculiarly maritime, would seem irrational.

Libel dismissed.